## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRIS WATKINS, ERIC DAY, GLOBAL LEASE GROUP INC., PRUDHVI SAMUDRALA, WILLIAM WILSON, KAREN KYUTUKYAN, RAJEEV TALREJA, GIORGIO PETRUZZIELLO, DREW TALREJA, KRIS NATHAN, EDUARD CHENETTE, WALID YASSIR, and VARSHA LUTHRA on behalf of themselves and all others similarly situated, | CASE NO. 1:24-cv-11384-PBS |
|           Plaintiffs, | |
|   v. | |
| ELON R. MUSK, individually and in his capacity as Trustee of the ELON MUSK REVOCABLE TRUST DATED JULY 22, 2003, | |
|           Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     BRIEF SUMMARY OF THE CASE......................................................................1

II.    INTRODUCTION AND BACKGROUND.........................................................2

III.   PARTIES.................................................................................................................7

IV.    JURISDICTION AND VENUE ..........................................................................8

V.     FACTUAL ALLEGATIONS................................................................................9

    A.   Musk Seized Power at Tesla to Manipulate It and
        Enrich Himself and His Trust...................................................................9

    B.   Musk Misrepresented Driving Range and Made
        Tesla Do the Same....................................................................................15

        1.   Musk Made False Representations and Misleading
            Omissions to Consumers About Tesla Range Totally
            Untethered to EPA Estimates and Made Tesla Do the Same. ......15

        2.   Musk Caused Tesla to Rig Dashboard Range Meters to
            Misrepresent Driving Range (Not EPA Estimates)
            Every Time Consumers Drove Their Vehicles. ...........................29

        3.   When Musk Referred to EPA Estimates
            (and Caused Tesla to), He Used Them with Additional
            Misrepresentations and Omissions to Consumers to
            Mislead Them About Driving Range ...........................................32

        4.   Musk Manipulated Tesla to Create a Diversion Team
            to Conceal His Fraud ...................................................................41

    C.   Numerous Sources (Including Musk's Own Statements)
        Confirm That Musk Lied About Driving Range and that
        he Manipulated Tesla to Lie Too.............................................................42

    D.   Plaintiffs' Experiences...........................................................................44

VI.    CLASS ACTION ALLEGATIONS ..................................................................47

VII.   COUNTS I - XVIII ................................................................................. 50 - 87

VIII.  PRAYER FOR RELIEF .....................................................................................88

IX.    DEMAND FOR JURY TRIAL .........................................................................88

Plaintiffs Chris Watkins, Eric Day, Global Lease Group Inc., Prudhvi Samudrala, William Wilson, Karen Kyutukyan, Rajeev Talreja, Giorgio Petruzziello, Drew Talreja, Kris Nathan, Eduard Chenette, Walid Yassir, and Varsha Luthra bring this action on behalf of themselves and all others similarly situated against Elon R. Musk, in his individual capacity and as Trustee of the Elon Musk Revocable Trust Dated July 22, 2003.

## I.      BRIEF SUMMARY OF THE CASE

1.      This is a class action brought by consumers who were swindled out of billions of dollars (at least tens of thousands each) by the world's richest person, Elon Musk, in connection with the advertising and sale of Tesla electric vehicles.  The basis of their claims is that Musk falsely represented Tesla driving ranges, concealed from consumers other key facts about vehicle driving ranges, took steps to manipulate vehicles' dashboard range meters to display false driving ranges, and then, to further avoid accountability, diverted consumer complaints to avoid accountability.  And he used his near-total control of Tesla to cause it to commit the same misconduct.

2.      Because of the critical importance of range to EV purchasers, this scheme allowed Musk to sell millions of vehicles at inflated prices, dominate the electric vehicle market, crush competition, and personally accumulate hundreds of billions of dollars for himself and his trust.  By personally devising, directing, and controlling this fraudulent scheme, Musk ensured that the benefits of this deception flowed directly to him, rather than simply benefiting Tesla as a company.  This was not a matter of corporate policy gone awry, but a deliberate, calculated effort by Musk to enrich himself at the expense of consumers and in breach of his duties to Tesla.

3.     Musk's conduct violated a litany of unfair and deceptive trade practice laws, all of which provide for personal liability because Musk personally formulated, directed, implemented, controlled, and instructed the fraudulent scheme. *See, e.g., S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F. Supp. 3d 197, 222 (D. Mass. 2016) ("[a]n officer of a corporation can be a proper defendant for purposes of" the Massachusetts Unfair Trade Practices Act where he or she has "knowledge of unlawful acts or actual participation in acts made unlawful by" the Act); *see also York Marine, Inc. v. M/V Intrepid*, 2016 WL 5372762, at *11 (D. Me. 2016); *Ne. Lumber Mfrs. Assoc. v. N. States Pallet Co.*, 710 F. Supp. 2d 179, 187–88 (D.N.H. 2010); *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008); *Allen v. V & A Bros.*, 26 A.3d 430, 441 (N.J. 2011); *Fed. Trade Comm'n by James v. Quincy Bioscience Holding*, 389 F. Supp. 3d 211, 220 (S.D.N.Y. 2019).

4.     These facts are not in dispute: As Musk **admitted** to a government regulator, he "engag[ed] in false, exaggerated, and deceptive advertising activities in manufacturing, importing, and selling our electric vehicles."  And because Musk perpetrated this fraud to enrich his revocable trust for which he is the sole trustee, defendant Elon Musk Revocable Trust dated July 22, 2003 is liable too.  By targeting Musk and his trust, this lawsuit aims to hold him accountable for the billions he unjustly accumulated at consumers' expense.

## II.     INTRODUCTION AND BACKGROUND

5.     Driving range is a critical, material factor in a consumer's decision to buy an EV.  The longer a vehicle can travel, the more attractive it is to potential customers, who pay a premium for longer driving distances.  That's because the main drawback to driving an EV is recharging, which takes substantially longer than filling up a gas tank.  There are substantially fewer EV charging locations than gas stations, and charging stations are entirely

lacking in certain areas.  Thus, most consumers won't even consider buying an EV if it can't drive more than 300 miles on a single charge.[1]  But most, if not all, Teslas could not achieve that level of range in real-world driving conditions.

6.     Musk had a fix to this dilemma: Lying.  Year after year, he overstated the ranges that Tesla vehicles can drive by an average of 26% or more, often describing the false ranges as "actual true-usable range" or "actual range" without referring to an EPA estimate or any estimate at all.  His personal Twitter account, which is the most followed in the world with 195.4 million followers as of the date of this Complaint, became the most powerful tool in shaping consumer sentiment towards Tesla.  Musk leveraged his enormous personal presence and influence, not just as the CEO of Tesla but as a global public figure, to propagate these false claims.  This made Tesla vehicles vastly more attractive than they otherwise would have been and opened a market of consumers who otherwise wouldn't have considered buying an EV.

7.     Musk did not stop at merely overstating Tesla's driving ranges personally; he actively ordered Tesla to disseminate these falsehoods through various channels as well.  As the CEO and the largest shareholder of Tesla, Musk wields unprecedented power over the company, a level of control that has drawn increasing scrutiny from prominent senators, other courts, Tesla board members, and shareholders alike.  These parties have questioned whether Musk is putting personal gain over fulfilling his fiduciary duties to the company and its shareholders.  Regardless of his unprecedented power, Musk exceeded his authority as CEO and utilized his near total control of Tesla to disseminate the same lies to potential customers

---

[1]Tom Randall, US Electric Cars Set Record With Almost 300-Mile Average Range, BLOOMBERG (Mar. 9, 2023), https://www.bloomberg.com/news/articles/2023-03-09/average-range-for-us-electric-cars-reached-a-record-291-miles.

through various mediums. By doing so, he ensured that misinformation about range was deeply embedded in the public's perception of Tesla vehicles.

8.     Musk, and Tesla at Musk's direction, consistently made overly inflated driving range claims that were not EPA estimates. These exaggerated representations were deliberately crafted to entice consumers by promising unparalleled performance, often suggesting that Tesla vehicles could achieve far greater ranges than what was realistically possible. This strategy was designed to attract potential buyers who were seeking vehicles capable of long-distance travel, thereby creating a significant gap between the vehicles' perceived and actual capabilities.

9.     Even when Tesla's website referenced EPA estimates, these figures were coupled with misleading additional misrepresentations or omissions to consumers that falsely indicated Tesla vehicles could achieve driving range in real-world conditions far beyond their actual capabilities. Regardless of whether EPA estimates were used, Musk manipulated the presentation of driving ranges, concealing key facts that would have revealed the true, more limited capabilities of the vehicles. This deliberate concealment ensured that consumers were misled about the actual performance of Tesla vehicles, further embedding the misinformation into the public's perception.

10.     And for Musk's scheme to be truly effective, he couldn't stop there. Dashboard range meters needed to reflect the misrepresented driving ranges too. Otherwise, purchasers would demand refunds as soon as they turned on their cars and saw that actual ranges were far less than promised. "The directive to present the optimistic range estimates" in the cars themselves thus "came from Tesla Chief Executive Elon Musk." Steve Stecklow and Norihiko Shirouzu, *Tesla Created Secret Team to Suppress Thousands of Driving Range Complaints,*

4

REUTERS, July 24, 2023, https://www.reuters.com/investigates/special-report/tesla-batteries-range/. "Elon wanted to show good range numbers when fully charged." *Id.* The reason? It helps sell more cars: "When you buy a car off the lot seeing 350-mile, 400-mile range, it makes you feel good." *Id.*

11.     Consequently, Musk took steps to rig the algorithm for the vehicles' dashboard range meters so they would display false drivable ranges. So, for example, the range meter of a fully charged Tesla would indicate 300 miles of drivable range, when in fact the actual range was around 200.

12.     In sum, Musk duped unsuspecting consumers into buying vehicles that would not drive nearly as far as claimed and made sure consumers would not readily realize this fact by depriving them of accurate range meters, leaving owners to guess how far they could drive their cars. The combined effect of the misrepresentations and omissions about Tesla's driving range in real-world conditions that Musk perpetrated year, after year, after year would deceive any reasonable consumer.

13.     Musk employed these schemes to enrich himself—and his revocable trust—by making Tesla the preeminent EV manufacturer—and Musk the richest man in the world. Musk did this largely because his CEO compensation package, which is the largest in history, is directly tied to increasing Tesla sales.

14.     As a uniquely powerful founding CEO who also owns more of the company than anyone else, Musk used his position of power and the shares his trust owns to manipulate Tesla, including its management, employees, and stakeholders, as part of his fraudulent scheme to enrich himself and the defendant entities that he controls and benefits from. In doing so, Musk acted beyond the scope of his authority at Tesla, breached his fiduciary duties

to the company and its public shareholders, and violated consumers' common law and statutory rights to not be deceived when making purchasing decisions.  Musk is liable for all this misconduct in his personal capacity.

15.     Musk's fraudulent scheme to overstate driving ranges and manipulate the range meters to personally enrich himself and his personal entities proved wildly successful.  In 2022, Tesla sold 1.31 million EVs—more than half of all EVs sold in the United States.  And four of the six best-selling EVs in the United States are Tesla models.  Through his deceptive conduct, Musk tricked consumers into believing that Tesla models can drive significantly farther than any of its competitors, making Musk billions.   Had customers known the cars could only drive far less than the distances claimed and that the range meters were rigged to state inflated numbers, they either would not have purchased Teslas or would not have paid as much for them, and Musk would have missed out on a fortune.

16.     Tesla has been inundated with customer complaints about vehicle driving ranges, and media reports have cited whistleblowers alleging that Musk lied about drivable ranges on Tesla models.  Multiple government bodies, including the Department of Justice and the South Korean Fair Trade Commission, have launched investigations into these and other false statements by Musk and Tesla.  In response, in January 2024, Tesla reduced the vehicle ranges advertised on its website, confirming that earlier representations about those ranges were false.

17.     These revelations have marred Tesla's reputation and the market value of Tesla models has plummeted by tens of thousands of dollars, further injuring owners and proving false Musk's promise that the cars would actually increase in value over time.  Because these revelations also caused a significant drop in Tesla vehicle sales, Musk responded by slashing

prices on Tesla vehicles, further injuring anyone who previously purchased a Tesla—and confirming that the vehicles he falsely represented were worth substantially less than what consumers paid for them.

### III.   PARTIES

12.     Plaintiff Chris Watkins is a resident of Massachusetts who purchased a Tesla in 2020.

13.     Plaintiff Eric Day is a resident of Massachusetts who purchased a Tesla in 2021.

14.     Plaintiff Global Lease Group Inc. is a Massachusetts company that purchased a Tesla in 2022.

15.     Plaintiff Giorgio Petruzziello is a resident of New Hampshire who purchased a Tesla in 2022.

16.     Plaintiff Prudhvi Samudrala is a resident of Illinois who purchased a Tesla in 2021.

17.     Plaintiff William Wilson is a resident of Florida who purchased a Tesla in 2021.

18.     Plaintiff Karen Kyutukyan is a resident of California who purchased a Tesla in 2021.

19.     Plaintiff Rajeev Talreja is a resident of New York who purchased a Tesla in New York in 2020 and in Florida in 2023.

20.     Plaintiff Drew Talreja is a resident of Kentucky who purchased a Tesla in 2022.

21.     Plaintiff Kris Nathan is a resident of New Jersey who purchased a Tesla in 2023.

22.     Plaintiff Eduard Chenette is a resident of Maine who purchased Teslas in 2019, 2021, and 2024.

23.     Plaintiff Walid Yassir is a resident of Michigan who purchased a Tesla in 2018.

24.     Plaintiff Varsha Luthra is a resident of Pennsylvania who purchased a Tesla with her husband in 2023.

25.     Defendant Elon Musk is a Texas citizen who resides in Boca Chica, Texas. Musk is Chief Executive Officer of Tesla and has used the company to defraud consumers, harming Massachusetts, New Hampshire, Maine, Washington, New Jersey, New York, Illinois, Pennsylvania, California, Kentucky, Michigan, and Florida residents who purchased Tesla vehicles.

26.     Musk is the sole trustee of, and controls, the "Elon Musk Revocable Trust dated July 22, 2003" (the "Musk Trust").  According to Musk's Schedule 13D filed on February 14, 2024, Musk's 20.5% ownership share of Tesla is held by the Musk Trust.

## IV.     JURISDICTION AND VENUE

27.     The Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 class members, a member of the Plaintiff Class is a citizen of a different from Defendants' home states, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

28.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) because events giving rise to these claims occurred in this District.  Specifically, Musk used his global platform, Tesla, and the shares held by his trust to defraud Massachusetts consumers by lying about vehicle driving ranges and manipulating the range meters on those vehicles.

29.     The Court has specific personal jurisdiction over Musk because Musk's and his trust's unlawful conduct were directed to and were intended to deceive Massachusetts consumers.  Massachusetts is one of the biggest markets for Tesla.  Musk therefore knew that lying about how far Tesla vehicles can drive and manipulating vehicle range meters accordingly (and using his trust's massive Tesla share ownership to do so) would injure Massachusetts consumers and greatly enrich himself and the Musk Trust.

## V.     FACTUAL ALLEGATIONS

### A.     Musk Seized Power at Tesla to Manipulate It and Enrich Himself and His Trust

30.     Tesla was founded in 2003.  By 2008, Musk became its CEO after allegedly forcing out the two original founders.[2]  Musk has been the single largest shareholder of Tesla since he first invested in it during the company's 2004 Series A funding round.  His ownership share has grown since then.   As of 2024, Musk owns and controls (through his trust) approximately 20.5% of the company's stock—far more than anyone else, including massive institutional investors.

31.     Musk's power at Tesla is extraordinary.  At least one court, *Tornetta v. Musk*, 310 A.3d 430, 507 (Del. Ch. 2024), has dubbed Musk a "Superstar CEO," a role that shifts the traditional balance of power between CEOs, management, the Board, and stockholders in the CEO's favor—making the independent actors "doubt their own judgment and hesitate to question the decisions of their superstar CEO."[3]  "'The *only* thing'" that holds Musk back

---

[2]Lora Kolodny & Erin Black, *Tesla Founders Martin Eberhard & Marc Tarpenning on Elon Musk*, CNBC (Feb. 6, 2021), https://www.cnbc.com/2021/02/06/tesla-founders-martin-eberhard-marc-tarpenning-on-elon-musk.html.

[3] *Id.* (citations omitted).

from his goals is whether his desire "'is constrained by the laws of physics[.]'"[4]  Musk is known for having a reality "distortion field" that subjugates corporate employees to his will, and weakens "mechanisms by which stockholders hold fiduciaries accountable."  *Tornetta*, 310 A.3d at 507.

32.     After securing a position of extraordinary power at the company, Musk abused it by manipulating the company as part of the fraudulent scheme described herein to enrich himself and the Musk Trust, breach his fiduciary duties to the company, and breach statutory and common law duties owed to consumers.

33.     Musk is well-documented as exceeding his authority for personal gain.  For instance, a Delaware Chancery Court noted that Musk has comingled personnel between his different companies without any formal arrangements.   Specifically, Musk enlisted approximately fifty Tesla engineers to provide services to Twitter following his acquisition of that company, none of whom were hired, retained, or paid by Twitter for services they provided to Twitter, a company privately owned by Musk.[5]

34.     Senator Elizabeth Warren recently questioned Musk's "significant legal… conflicts of interest and misappropriation of corporate resources[.]"[6]  In a letter addressed to Tesla Chairwoman Robyn Denholm, Warren expressed serious concerns about Musk's actions, which she argues prioritize his personal interests over those of Tesla shareholders.

---

[4] Richard Waters, *Elon Musk, billionaire tech idealist and space entrepreneur*, FIN. TIMES (Sept. 30, 2016), https://www.ft.com/content/8ca82034-86d0-11e6-bcfc-debbef66f80e (quoting Peter Diamandis, fellow space entrepreneur).

[5] *Tornetta v. Musk*, 310 A.3d 430, 494 (Del. Ch. 2024).

[6] Elizabeth Warren, U.S. Senator, *Letter to Tesla Chairwoman Robyn Denholm Regarding Elon Musk's Conflicts of Interest* (Aug. 8, 2024), https://www.warren.senate.gov/imo/media/doc/final_-_warren_letter_to_tesla_board_re_musk_conflicts_of_interest.pdf.

Warren's letter underscores the severity of the governance issues at Tesla under Musk's leadership, and the undue influence he holds over the company to use it to serve his own interests above all else, to the detriment of both Tesla and consumers.

35.     A series of shareholder derivative lawsuits have also recently been filed against Musk, accusing Musk of breaching his fiduciary duties by diverting Tesla's resources to support his personal ventures, including his AI company, xAI.[7]  These lawsuits allege that Musk poached Tesla employees and misallocated company resources to benefit his private projects.  These allegations further underscore the governance issues raised by Senator Warren and the power of Musk in his personal capacity, outside of his role as a normal CEO, to control and manipulate Tesla.

36.     One former Tesla board member resigned due to the dysfunctional nature of the board.  This director "found the board to operate more like a family company with fiefdoms, rather than a public company with stringent rules and regulations."[8]

37.     Musk's personal control over company matters have also been reported by Tesla employees, who have stated that Musk is involved in the most minute decisions at the company.[9]  Musk himself has bragged about sleeping at Tesla factories for extended periods of time.  Musk has also professed knowledge of minor details concerning the testing of Tesla

---

[7] Meghan. Bobrowsky, *Elon Musk and Tesla Shore Up AI Business Amid Legal Scrutiny*, WALL ST. J. (Aug. 11, 2024),  https://www.wsj.com/tech/elon-musk-tesla-shore-up-ai-business-d4e2187f.

[8] Kirsten Grind, Emily Glazer, Rebecca Elliott & Coulter Jones, *The Money and Drugs That Tie Elon Musk to Some Tesla Directors*, WALL ST. J. (Feb. 3, 2024), https://www.wsj.com/tech/elon-musk-tesla-money-drugs-board-61af9ac4.

[9] Lora Kolodny, *Elon Musk's extreme micro-management has wasted time and money at tesla, insiders say*, CNBC (Oct. 19, 2018), https://www.cnbc.com/2018/10/19/cnbcs-lora-kolodny-elon-musks-extreme-micro-management-has-wasted-time-and-money-at-tesla-insiders-say.html.

driving ranges, like the impact of someone leaving "the car door opened and the keys in the car."[10]

38.     Musk's personal control over Tesla extends to its marketing and advertising strategies. He directly controls those strategies even though they would typically be handled by marketing departments in other companies.

39.     Unlike traditional automakers that spend tens of billions of dollars on advertising, Tesla has historically spent little to nothing.[11]   Only after Musk acquired X (formerly Twitter) in 2023—a company reliant on advertising revenue from other businesses—did Musk, using his personal account, announce that he was personally altering Tesla's marketing strategy to begin utilizing small-scale advertising.[12]

40.     Although Tesla, under Musk's control, hired its first marketing team in 2023, that team was laid off after less than a year. [13]  Musk has always used the global influence of his own persona as the primary source of Tesla's marketing.[14] As one writer explains, "[I]t's exactly Musk's idiosyncratic approach that has driven the legend (and sales) of Tesla.  I spoke

---

[10] *See* Tesla, *supra* note 2.

[11] Jeff Beer, *Elon Musk Has to Decide: Does He Want to Be Steve Jobs" or Papa John?*, FAST CO. (May 19, 2020),  https://www.fastcompany.com/90506206/elon-musk-has-to-decide-does-he-want-to-be-steve-jobs-or-papa-john.

[12] *See* Elon Musk (@elonmusk), Twitter (Oct. 23, 2023) (https://twitter.com/elonmusk/status/1716331220726951975) (where Musk, in responding to a user's tweet about Tesla marketing, stated "I said we would advertise. We are doing so at small scale and will do so at larger scale as we figure what works best.").

[13] Owen Bellwood, *Elon Musk's Tesla Got Rid of Its Entire Marketing Team in Mass Layoffs*, QUARTZ (April 23, 2024),  https://qz.com/tesla-content-growth-cybertruck-layoffs-1851429138.

[14] Tom Randall, *Tesla's Model 3 Success Hits BMW the Hardest*, BLOOMBERG (November 12, 2019),   https://www.bloomberg.com/graphics/2019-tesla-model-3-survey/market-evolution.html.

to several major advertising agency execs on background, and all point to Musk's canny ability to make the Tesla brand in his own image and have it be the sole driving force."[15]

41.     Musk has utilized his personal X account, along with other mass public communications, to spread his misrepresentations and material omissions about Tesla's range capabilities to great success.  Musk's X account is the most followed account in the world— with almost 195.4 million followers as of August 2024.[16]  Musk's public communications generate substantial media coverage and public discourse that have bolstered Tesla's brand and influenced consumer perceptions, largely to the benefit of Musk and the Musk Trust.[17] One author explains that "Tesla has grown at an incredible rate and created massive amounts of wealth", and "all primarily on the back of Musk's personal promotion and brand image."[18]

42.     Musk needs this growth for Tesla because, although a publicly traded company, he sees it as a personal piggy bank providing the monetary means to his own ends.  One court has noted that "Musk views his compensation from Tesla as a means of bankrolling" his

---

[15] *Id.*

[16] @elonmusk, TWITTER, https://twitter.com/elonmusk (last visited Aug. 22, 2024, 11:35 am).

[17] *See Driving for Success: Tesla's Public Relations Strategy*, PRLAB, https://prlab.co/blog/tesla-public-relations-strategy/ (last visited Aug. 13, 2024); *An In-Depth Look at Tesla's Marketing Strategy*, DIGITAL AGENCY NETWORK, https://digitalagencynetwork.com/tesla-marketing-strategy/ (last visited Aug. 13, 2024); *Tesla's Marketing Strategy Broken Down: A Path to Electric Excellence*, BOLD X COLLECTIVE, https://www.boldxcollective.com/insights-blog/teslas-marketing-strategy-broken-down-a-path-to-electric-excellence (last visited Aug. 13, 2024).

[18] Jeff Beer, *Tesla Axed Its Entire Marketing Team—Here's Why That Matters*, FAST CO. (April 26, 2024), https://www.fastcompany.com/91113609/tesla-axed-its-entire-marketing-team-heres-why-that-matters.

personal pet projects.[19]  And in emails between Musk and stakeholders at another of Musk's

former pet projects, OpenAI, Musk suggested that "OpenAI" use "Tesla *as its cash cow.*"[20]

43.     Musk's compensation package at Tesla is directly linked to the company

achieving specific market value milestones.  This arrangement motivates him to maximize

Tesla's market value by any means necessary to enrich himself and the Musk Trust, including

by overstating the driving ranges of Tesla vehicles and rigging their range meters, as explained

in greater detail below.  And the value of Musk's equity in Tesla has seen a dramatic rise

coinciding with these fraudulent statements and omissions.  Since 2018, the value of his Tesla

equity has surged by almost 1,000%, increasing from approximately $11.7 billion to over $120

billion.

44.     Musk's scheme to enrich himself and the Musk Trust by manipulating Tesla to

defraud the public has been tremendously successful.  Musk's compensation package from

Tesla has made him the highest-paid CEO in U.S. (and world) history, even though his

contract does not require Musk to spend any specific amount of time on Tesla-specific duties.

Musk's equity in the company, for example, was valued at just under $200 billion in 2022.

---

[19] *Tornetta*, 310 A.3d at 452 (citing to excerpts of Musk's trial testimony); *see also id.* ("Musk sees working at Tesla as worthy of his time only if that work generates 'additional economic resources . . . that could . . . be applied to making life multi-planetary.'") (quoting Musk's trial testimony).

[20] *OpenAI & Elon Musk*, OPENAI (March 5, 2024), https://openai.com/index/openai-elon-musk/.  OpenAI is an artificial intelligence company that Musk co-founded and is now suing for breaking from its non-profit mission at the same time he started a competing for-profit AI venture himself.  *See* Michael Dorgan, *Elon Musk Suing OpenAI, Sam Altman for Breaching Not for Profit Mission*, FOX BUSINESS (Mar. 1, 2024), https://www.foxbusiness.com/technology/elon-musk-suing-openai-sam-altman-breaching-not-profit-mission).

**B.** ***Musk Misrepresented Driving Range and Made Tesla Do the Same.***

45.    Musk perpetrated a scheme to deceive consumers into purchasing Teslas by constantly telling all sorts of lies about their range.  First, he made deceptive statements and omissions about driving range totally untethered to any EPA estimate (or any estimate at all). Second, he rigged the dashboard range meters to misrepresent driving range, retelling the lies about actual driving range—not EPA estimates—every time consumers drove their vehicles. Third, when he referred to EPA estimates, Musk used them with deceptive additional statements and omissions to consumers beyond the EPA estimates themselves to falsely suggest that EPA estimates were achievable in real-world conditions despite knowing they were not.  Musk also used his control of Tesla to make the company tell all the same lies about range that he did.   The combined effect of these misrepresentations would deceive any reasonable consumer.  And they made Musk and his Trust the richest in the world.

1.    ***Musk Made False Representations and Misleading Omissions to Consumers About Tesla Range Totally Untethered to EPA Estimates and Made Tesla Do the Same.***

46.    Musk has constantly made affirmative statements regarding Tesla driving ranges in real-world conditions untethered to any EPA estimate, all to deceive consumers. Leveraging his self-proclaimed micromanagement of Tesla and the extraordinary influence of his personal presence, Musk has also similarly directed Tesla to fraudulently inflate vehicle ranges untethered to EPA estimates, further misleading consumers.

47.    As discussed above earlier, Musk has strategically integrated his personal X account into Tesla's marketing and public relations efforts, using it as a primary vehicle for spreading misinformation about Tesla ranges.  Through his X account, Musk frequently makes affirmative statements regarding Tesla actual driving ranges—not EPA estimates—

and he often compares Tesla's performance to that of fully or partially gas-powered vehicles to further distort the truth.   The below recounts just a few examples of Musk's misrepresentations about actual driving range, not EPA estimates.

48.     On May 20, 2018, Musk falsely claimed the Model 3's actual range was 310 miles (without referring to any EPA estimate or any estimate at all), compared it to a BMW M3 (which uses a gas-powered engine), and stated it would "beat anything in its class on the track:"



49.   In February 2020, Musk tweeted a link to a Consumer Reports article and falsely stated that the "Model 3 achieves **350 mile actual range** vs 310 EPA sticker in Consumer Reports testing:"



50.   Musk knew his statement was false, and that it misleadingly characterized the very Consumer Reports article it linked to.  That article did not claim that Consumer Reports had achieved 40 miles more than "the EPA sticker."[21]   The article states that Consumer

---

[21] Jeff Plungis, *Tesla Ups Ante on Model Y Range, Underscoring Its EV Lead*, CONSUMER REPORTS (Feb. 18, 2020), https://www.consumerreports.org/hybrids-evs/tesla-ups-ante-on-model-y-range-underscoring-ev-lead/?srsltid=AfmBOopWVmJ2A9B9RfIFtKxBUj50vnPWCDb2aJoq-JspDTwDLQJyAZbt.

Reports was only able to get 350 miles when it tested a Model 3 *Long Range*,[22] and then only when it switched the car into a special setting designed to utilize the vehicle's battery in a way that, by Tesla's own warning, would "cause battery degradation" and require longer charging times.[23]   Indeed, Consumer Reports only obtained this range when utilizing "aggressive regenerative braking"—a style of driving not indicative of normal consumer behavior or EPA testing parameters,[24] which Musk knew.  And even if Musk's statement were true regarding the Model 3 Long Range, it still would be per se deceptive under FTC guidance, because it doesn't distinguish which version of the Model 3 achieved that range, nor does it disclose under what conditions.[25]

51.     In July 2020, Musk similarly made false claims regarding the Model Y and stated it would have a range "significantly higher than 300" miles, without making a reference to EPA estimate, testing criteria, model type, or driving mode:

---

[22] The article references Consumer Reports' testing, which the company clarifies was a Model 3 Long Range.   *See Tesla Model 3 Road Test Report*, CONSUMER REPORTS (2020), https://www.consumerreports.org/cars/tesla/model-3/2020/road-test-report/?srsltid=AfmBOoqjOrV41tbMn0ss3qytMSeNuw4Mmrqv1h_8JSUt4Z3WRLJtf1Du.

[23] *See* Plungis, *supra* n. 21.

[24] *See Tesla Model 3 Road Test Report*, CONSUMER REPORTS, *supra* n. 22.

[25] *See* 16 C.F.R. § 259.4; *see also* Federal Trade Commission, *FTC Report: Many Consumers Believe Claims Promise Maximum Results*, FTC (June 19, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/06/ftc-report-many-consumers-believe-claims-promise-maximum-results.   The "Guide Concerning Fuel Economy Advertising for New Automobiles" from the Federal Register outlines that any advertising claims about fuel economy, including range, must be based on the results of tests prescribed by the Environmental Protection Agency (EPA). Advertisers must clearly disclose if the range or fuel economy estimates are based on non-EPA tests and ensure that such claims do not mislead consumers by omitting critical information, such as the specific conditions under which the advertised figures were achieved.



52.     In March 2022, after Tesla failed to deliver a 600-mile electric car that Musk promised years earlier, Musk falsely claimed:



53.     None of Tesla's cars have a "400+ mile range," and Musk knew that.

54.     In May 2024, Musk falsely tweeted that the "'260 Mile' range Model Y's built over the past several months actually have more range that can be unlocked for $1500 to $2000 (gains 40 to 60 miles of range)":



55.     In July 2024, Musk falsely tweeted that the Model 3 had a 363-mile actual range, yet again without referring to an EPA estimate or any estimate at all:



57.     Musk also misrepresented Tesla vehicle ranges at various other presentations to the public.   For example, Musk lied about the range of Tesla's Model S in a public corporate earnings call on April 29, 2020, where he reported that "the real Model S range is 400 miles."[26]   As Musk knew, that figure was substantially higher than the actual range. Indeed, independent third-party testing estimated that Teslas underperform their stated ranges by about 26% on average.[27]

58.     At another point in 2019, when Musk introduced the Model Y, he falsely claimed the car had "an actual true-usable range of 300 miles," even though he knew the true range was substantially less.     https://youtu.be/w3s1awGu1-M?si=O7eWU5A9x6LG9iD_&t=96:



actual true usable range of 300 miles so

---

[26]Tesla,     Inc.     (TSLA)     Q1     2020     Earnings     Call     Transcript, https://www.fool.com/earnings/call-transcripts/2020/04/30/tesla-inc-tsla-q1-2020-earnings-call-transcript.aspx (last visited Aug. 22, 2024).
[27] Jonathan Elfalan, Cameron Rogers, *Electric Car Range and Consumption: EPA vs. Edmunds*, EDMUNDS (May 22, 2024), https://www.edmunds.com/car-news/electric-car-range-and-consumption-epa-vs-edmunds.html.

59.     Musk likewise claimed that the Model S-Plaid has "almost a 400-mile range," even though he knew the true range was substantially less. https://youtu.be/PNbusPm46Cw?si=YuAhs-UD8sCLpKP6&t=20:



60.     None of these vehicles have an actual range as high as Musk claimed, and Musk (who has admitted he is responsible for Tesla's technology, and who himself drives a Tesla Model S) knew and knows that.

61.     Musk was responsible for the contents of all the above misrepresentations about range (and many others) and could alter them unilaterally without agency approval.

62.     Musk used his control of Tesla to cause it to make similarly fraudulent range claims without any reference to EPA estimates.  During the time many consumers purchased their vehicles, Tesla's website and marketing materials contained affirmative statements about

vehicle ranges that did not cite  the "EPA" or any "estimate."  As evidenced by his public statements, Musk directed Tesla to prominently display these inflated ranges on the website, fully aware of how crucial driving range is to consumers and how consumers would interpret these figures.  These deceptive statements go far beyond the disclosure of EPA mileage estimates required under federal law.

63.     For instance, the Model S webpage claimed 370 miles of actual range without referring to the EPA or any estimate:



64.     Similarly, the Model 3 webpage claimed 353 miles of actual range without referring to the EPA or any estimate:



65.    And the Model X webpage claimed 340 miles of actual range without referring to the EPA or any estimate:



66.    Even as of the date this amended complaint was filed, many order pages for Teslas claimed actual ranges without referring to any EPA estimate.  For example, the Model 3 order webpage claimed 322 miles of actual range for vehicles with 19'' wheels without referring to any EPA estimate:



67.     As of the date this amended complaint was filed, many order pages for used Teslas likewise claimed actual ranges without referring to any EPA estimate.  For example, a used Model S order page claimed 375 miles of actual range without referring to any EPA estimate:



68.     In addition, Tesla, under Musk's control, used Tesla's twitter account to tweet Model 3 specifications without using an "EPA Estimate" or any estimate:



69.     In addition to misrepresenting driving ranges in terms of miles, Musk also ordered Tesla to make other misrepresentations about how far its vehicles could travel in the real world in other sections of the website.  These additional misrepresentations aren't EPA estimates.

70.     For example, in a "Freedom to Travel" map for the Model S, the website read:



71.     This "Freedom to Travel" map implies that the Model S can make a trip from San Francisco to Los Angeles on a single charge, but that's not possible.   And numerous Model S owners have discovered as much and have complained about it in online forums:

- "405 miles range is a joke . . . actual range . . . would be 330-340 miles."

- "According to my calculations it's real world range was around 320-330 miles."

- "275 miles for me. Start at 100. Until 50 miles left. Actual distance plus 50 miles equals 275 miles or so."

- "[T]he vehicle is rated at 405 miles, but [I] cannot get anywhere close to that range.' Yup. Neither can anyone else, because it's not realistic."

- "My calculations show that we got 258 miles with 100% of a full charge (325 miles with 126%)!"

- "400 miles is an unachievable fantasy to begin with."

72.     And the story is the same for other model owners:

- For the Model 3 standard range, one user complained: "I purchased a model 3. Not a long range nor a dual motor model. Said I should get 273 mi per charge. I seem to get about half that."

- Another Model 3 owner complained: "my real world range is about 203 miles . . . [when it] should have ~322 miles (rated range obviously)."

- And a Model Y long range owner complained: "the actual mileage I got was at best 244 miles, kind of shocking."

- And for the Model X: "My experience so far seems to put real world range at about 22-25 miles per 10% battery so around 220-250 miles on a full charge."

73.     Musk was responsible for causing Tesla to make misrepresentations about range with the above content (among many other misrepresentations) and could alter them unilaterally without agency approval.

74.     As shown above, to enrich himself and the Musk Trust, Musk for years made false claims about the ranges Tesla vehicles could travel without any reference to "EPA estimates."  And he made Tesla do the same.

75.     In addition to making affirmative misrepresentations about Tesla's driving ranges, Musk intentionally concealed material facts in a further effort to deceive any reasonable consumer. And he made Tesla do the same.

76.     Musk concealed from consumers the inherent limitations that significantly affected the advertised driving ranges and made them impossible to achieve in real-world conditions.  Musk, and Tesla under Musk's control, intentionally omitted the fact that the touted ranges could not be consistently achieved, or achieved at all, under conditions that most drivers would encounter in their everyday use.  These undisclosed factors included the significant range reduction caused by cold weather and the unrealistic driving patterns required to meet the advertised ranges.  Hiding these truths, as Musk and Tesla under Musk's control did, would further deceive any reasonable consumer into believing that Tesla vehicles

could achieve driving ranges in real-world conditions that they simply could not. For example:

- Musk made false claims about range without disclosing that they were unattainable in real-world driving conditions (and caused Tesla to do the same).

- Musk made false claims about range without disclosing that ordinary weather conditions, like cold temperatures, dramatically reduced range even farther below the already inflated claims (and caused Tesla to do the same).

77.     Musk was also responsible for causing Tesla to make omissions about range and could alter them unilaterally without agency approval.

### 2. Musk Caused Tesla to Rig Dashboard Range Meters to Misrepresent Driving Range (Not EPA Estimates) Every Time Consumers Drove Their Vehicles.

78.     Musk's fraudulent scheme would have been easily exposed if he relied solely on misleading public statements about vehicle driving ranges. Potential customers would have immediately recognized the deception during a test drive when they observed the actual ranges displayed on the dashboard.[28] And for those customers who purchased their vehicles online without a test drive, they would have returned the vehicle within the seven-day return period Tesla previously adhered to, once the new owners detected the lies upon starting their cars and seeing the true range readings.[29] To prevent this, Musk directed Tesla's engineers to

---

[28] At least 66% of Tesla purchasers test drove their vehicle prior to purchasing it during 2017-2019. *See* Tim Higgins & Adrienne Roberts, Tesla Takes New Road in Pushing Car Sales Online Only, Wall St. J. (Mar. 3, 2019), https://www.wsj.com/articles/tesla-takes-new-road-in-pushing-car-sales-online-only-11551620986.

[29] *See id.* (where Musk justified closing some showrooms as a "move consistent with the times, and touted a seven-day return policy and a shopping process that he said will take just a

alter the software controlling the range meter, ensuring that the vehicles displayed exaggerated driving ranges that matched his false claims.

79.     Among other things, the range meter purports to inform drivers approximately how far their vehicles can travel on the remaining battery charge.  For example, the image below shows a Tesla Model S range meter claiming a range of 385 miles:



80.     The range meters in Teslas state falsely inflated ranges without referring to any EPA estimate (or any estimate at all), as shown in the screenshot above.

---

minute to complete."). Tesla "discreetly" canceled its seven day return policy at some point, and it's "unclear" what the current policy is.  Kenny Norman, *What You Didn't Know About Tesla's 2023 Return Policy*, HOTCARS (July 11, 2023), https://www.hotcars.com/tesla-return-policy-2023/.

81.    "The directive to present the optimistic range estimates came from Tesla Chief Executive Elon Musk."[30]  As insiders have confirmed, "Elon wanted to show good range numbers when fully charged" to deceive customers into buying Teslas for more than they were worth.[31]

82.    Musk directed Tesla employees to "write algorithms for its range meter that would show drivers 'rosy' projections" specifically "for marketing purposes."[32]  Indeed, the deceptive behavior was a part of Musk's design to mislead consumers into purchasing Teslas for far more than they were worth.

83.    Again, numerous Tesla owners have posted online complaints about the inaccurate range meters.  For example:

- One Model S owner said: "When fully charged it [the range meter] says 405 miles yet my real world range is 280 miles."

- A Model 3 owner similarly reported: "The route I took is 7.1 miles, but according to the car, I used 11 miles of battery range."

- And a Model Y owner reported: "I drove about 107.1 miles, but lost 133 in range."

84.    Moreover, the range meter only begins to provide a more accurate reading when the battery charge drops below 50%, presumably to prevent motorists from becoming stranded, which would cause more scrutiny of the false range claims.  Thus, the inaccurate range meter is not the result of technical limitations.  Tesla—which also claims to have near

---

[30] Special Report Team, *Tesla's Battery Range: An Investigation*, REUTERS (July 27, 2023), https://www.reuters.com/investigates/special-report/tesla-batteries-range/.
[31] *Id.*
[32] *Id.*

fully autonomous vehicles—of course had the ability to provide accurate range readings for full battery charges.  But Musk ordered the company to provide false readings to deceive customers about this critical aspect of the vehicle's performance.

85.    The range meters Musk rigged would deceive any reasonable consumer about the range Teslas could achieve in real-world driving conditions regardless of any EPA estimates.

86.    Musk was responsible for causing Tesla to rig the range meters and could alter them unilaterally without agency approval.  In fact, the EPA does not regulate the range meters and did not approve the functionality of the range meters in Tesla.

87.    As a result of Musk's manipulation, Tesla owners were deprived of basic, critical information about the capabilities of their vehicles every time they drove their vehicles, all because Musk wanted to sell more vehicles and manipulate the market.

> **3.     When Musk Referred to EPA Estimates (and Caused Tesla to), He Used Them with Additional Misrepresentations and Omissions to Consumers to Mislead Them About Driving Range**

88.    The Environmental Protection Agency ("EPA") reviews fuel economy figures for vehicles sold in the United States.  The Federal Trade Commission ("FTC") requires that when an auto manufacturer advertises vehicle fuel economy, it must state that the figure is an "estimate" and identify the EPA "as the source . . . so consumers understand that the estimate is comparable to EPA estimates for competing models."  16 C.F.R. § 259.4(d), (e).

89.    Per 49 U.S. Code § 32901(a)(11), the definition of "fuel economy" is "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." For EVs, "fuel economy" is measured by MPGe, which stands for miles per gallon of gasoline-equivalent. In the EPA's words, MPGe is "similar to MPG,

but instead of presenting miles per gallon of the vehicle's fuel type, it represents the number of miles the vehicle can go using a quantity of fuel with the same energy content as a gallon of gasoline.  This allows a reasonable comparison between vehicles using different fuels."[33] Estimated range is not MPGe and it is not a measure of fuel economy.

90.     Setting that aside, Musk used EPA range estimates with additional misrepresentations and omissions to consumers to mislead them about the range Teslas could achieve in real-world driving conditions.  Musk likewise caused Tesla to do the same.

91.     For example, in May 2021, Tesla changed the Model 3's webpage to include "EPA Estimate" on one section of the page:



92.     However, on another portion of the same page, Tesla, under Musk's control, claimed the consumer could "**[g]o anywhere** with up to **353 mi of estimated range** on a single charge" without any reference to the EPA:

---

[33]U.S. EPA, *Text Version of the Electric Vehicle Label*, EPA.GOV (last visited Aug. 26, 2024), https://www.epa.gov/fueleconomy/text-version-electric-vehicle-label#2.



93.     These additional statements separate from EPA estimates were untrue and misleading.  The use of "up to" 353 miles of range, as well as the omission of which specific model or driving mode on which the range claim is based, are all per se misleading according to the FTC.[34]  Indeed, this language implies to any reasonable consumer that this was the actual "estimated range" that would be achieved in the real world.  That is especially so because the website depicted a Tesla on the road near mountains to falsely suggest that the car could obtain "up to 353 mi of estimated range on a single charge" in real-world driving conditions even though that is not true.

94.     Not only did Musk cause Tesla to make misleading statements to consumers separate from EPA estimates, but he also caused Tesla to make misleading omissions to consumers.

---

[34] 16 C.F.R. § 259.4; *see also* Federal Trade Commission, *FTC Report: Many Consumers Believe Claims Promise Maximum Results*, (June 21, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/06/ftc-report-many-consumers-believe-claims-promise-maximum-results.

95.     Material omissions can be as deceiving as affirmative misrepresentations.  As Musk himself has acknowledged, "propaganda isn't just about creating fake news." It's "also about hiding real news:"[35]



96.     Hiding real news about vehicle range is precisely what Musk did.  And he made Tesla do the same.

97.     For example, the *only* references to weather on the webpage above were to boast about the Model 3's "[u]nparalleled traction and control, in all weather conditions," which omitted  the fact that weather materially impairs the vehicle's driving range:

---

[35] https://x.com/elonmusk/status/1826630645319373112



98.     Another portion on the same page depicted a Model 3 driving through snow-capped, icy mountains, to further boast about the Model 3's performance "in all weather conditions," which omits that cold weather like that would cause the car to get a fraction of the displayed range:



99.     These additional misrepresentations and omissions to consumers are separate from EPA estimates and would lead a reasonable consumer to falsely believe Teslas obtain the advertised range in real-world conditions, even driving through icy mountains.

100.   Further, when the consumer pressed "ORDER NOW," the site would take them to the following order page:



101.   When the consumer clicked on the "Learn More about Range and Performance" link, a pop-up would appear that contained additional ranges (without any reference to "EPA" or "estimate"), along with a statement that "[f]or the best long-range driving experience in the coldest driving conditions, we recommend a Long Range or Performance Model 3":



102.    This language omits that weather conditions materially affect the Model 3's driving range in real-world conditions.  It merely acknowledges that the "Long Range" and "Performance" versions of the Model 3 have better driving ranges than the standard version—which has nothing to do with weather conditions.  It also refers only to "very cold weather," implying that the cars perform normally in cool or just plain cold weather, creating a misleading impression that cold weather has a minimal impact on range.

103.    Omissions like the above were material because they falsely led consumers to believe that EPA estimates were a reliable predictor of real-world performance, regardless of driving mode and conditions, which was false and deceptive per se under FTC guidance.[36]

104.    This is in sharp contrast to other EV carmakers at the same time, who stress at the point of purchase that their estimates are based on EPA estimates, which are useful for comparing models to other EPA estimates only, and also stress the impact that cold weather has on the range.  For example, Porsche, like Tesla, displays EV range as the first feature on its website.  But unlike Tesla, Porsche includes a double asterisk next to range ("**") that links to an entirely separate page of warnings about range, including the impact of cold weather.  Musk ensured that Tesla did not make similar disclosures, whether using EPA estimates or not.  In any event, Musk used EPA estimates to give consumers the false impression that their Teslas would obtain unrealistically high range in real-world driving conditions.

---

[36] *See* 16 C.F.R. § 259.4.  In sharp contrast, most EV automakers have strong disclaimers, or even whole web pages, dedicated to explaining how battery range can be affected by multiple factors, including weather.  *See* https://www.audiusa.com/us/web/en/ev-hub/range.html (explaining Audi's range capabilities and factors that could hinder it).

105.   Musk was responsible for using EPA range estimates with additional misrepresentations and omissions to consumers and could alter them unilaterally without agency approval (and for causing Tesla to do the same).  The EPA does not regulate or control what statements and omissions are made with EPA-approved estimates.

106.   Musk's manipulation of Tesla to make false statements, as well as his own personal false statements, regarding vehicle ranges is well-documented in media reports:

- "Elon Musk reportedly gave the order himself for the displays in Teslas to present overly optimistic estimates of driving range;"[37]

- "For years, Tesla has earned a reputation for over-estimating its range figures, with the EPA claiming that CEO Elon Musk exaggerated the 400-mile range for the Tesla Model S Long Range back in 2020;"[38]

- "Elon Musk lied about the EPA's Tesla Model S test, agency claims;"[39]

- "'Elon wanted to show good range numbers when fully charged,' the [source] said, adding: 'When you buy a car off the lot seeing 350-mile, 400-mile range, it makes you feel good.'"[40]

[37] Grace Kay, *Elon Musk Gave Order for Tesla to Display Optimistic Driving Range: Report*, BUS. INSIDER (July 27, 2023), https://www.businessinsider.com/elon-musk-gave-order-tesla-display-optimistic-driving-range-report-2023-7.

[38] Sean Hollister, *Tesla Lowers Range Estimations for Model X, S, Y Amid Mileage Exaggeration Claims*, THE VERGE (Jan. 5, 2024), https://www.theverge.com/2024/1/5/24026367/tesla-lowers-range-estimations-model-x-s-y-mileage-exaggeration.

[39] Sean O'Kane, *Elon Musk Said He Deliberately Took Steps to Mislead the EPA about Tesla Model S Range*, THE VERGE (May 1, 2020), https://www.theverge.com/2020/5/1/21244556/elon-musk-lie-epa-tesla-model-s-range-miles-mistake-door.

[40] Special Report Team, *Tesla's Battery Range: An Investigation*, REUTERS (July 27, 2023), https://www.reuters.com/investigates/special-report/tesla-batteries-range/.

- "Tesla's EV Range Is Far From Accurate (And That's on Purpose);"[41]

- "Elon Musk had Tesla overstate its battery range.  Tesla then canceled related service appointments."[42]

- "Tesla programmers rigged the cars' range-estimating software to exaggerate how far they could go without running out of battery and then, when charge on the battery fell below 50%, readjust to a more realistic projection, one Tesla employee told Reuters—an idea that came directly from CEO Elon Musk himself."[43]

- "A source that spoke to Reuters for the piece suggests that this issue was in part the result of an algorithm intentionally designed to give 'rosy' projections, adding that the instruction to build in misleadingly optimistic estimates came directly from Tesla executive and mascot Elon Musk."[44]

107.    In sum, based on the combined effect of Musk's misrepresentations and omissions about range (and the misrepresentations and omissions he caused Tesla to make), any reasonable consumer would have expected Teslas to achieve higher range in real-world conditions than they actually do.

---

[41] Ian Kreitzberg, *Tesla's EV Range: Far From Accurate on Purpose*, THE STREET (July 27, 2023), https://www.thestreet.com/electric-vehicles/teslas-ev-range-far-from-accurate-on-purpose.

[42] Chris Taylor, Tesla, *Elon Musk Inflated Driving Range: Report*, MASHABLE (July 27, 2023), https://mashable.com/article/tesla-elon-musk-inflated-driving-range-report.

[43] Mary Roeloffs, *Tesla Exaggerated Its Cars' Driving Range and Canceled Service Appointments If Drivers Complained, Report Says*, FORBES (July 27, 2023), https://www.forbes.com/sites/maryroeloffs/2023/07/27/tesla-exaggerated-its-cars-driving-range-and-canceled-service-appointments-if-drivers-complained-report-says/?sh=6a0af327d9c4.

[44] Fred Smith, *Tesla's In-Car Range Estimates Have Reportedly Been Overstated for Years*, ROAD & TRACK (July 27, 2023), https://www.roadandtrack.com/news/a44664189/teslas-in-car-range-estimates-have-reportedly-been-overstated-for-years/.

108.     These claims are premised on fraudulent representations and omissions *to consumers*.  They do not require proof of noncompliance with EPA regulations or of a fraud on the EPA or any other regulator.   Regardless of whether Musk complied with EPA regulations, he still misrepresented and concealed material information from consumers and caused Tesla to do the same.

### 4.     *Musk Manipulated Tesla to Create a Diversion Team to Conceal His Fraud*

109.     Once Tesla owners realized that their cars weren't performing as Musk claimed, Tesla was inundated with service requests complaining about the cars' mileage.  But Musk knew that servicing the cars would be pointless because the vehicles were working as designed—to provide lower driving ranges than advertised.   So to avoid having to waste resources and having the lies exposed, Musk implemented a "Diversion Team."

110.     The Diversion Team was designed to perpetuate Musk's fraud by preventing customers from having their vehicles serviced for range-related issues.  For example, when a customer scheduled a service appointment to address the vehicle's driving range, a member of the Diversion Team would conduct a "remote diagnostic" and, regardless of the results, tell the customer that the vehicle was fine and cancel the appointment.  The Diversion Team further told customers that the stated range was a "prediction" rather than an actual measurement and falsely suggested that the range issues were the result of the batteries naturally degrading over time.  The Diversion Team did not tell the truth: the ranges that Tesla's vehicles could travel were exaggerated (at Musk's direction), and the range meter deliberately misstated driving ranges (also at Musk's direction).  Indeed, the whole point of the "Diversion Team" was to divert attention from Musk's deception.

### C. Numerous Sources (Including Musk's Own Statements) Confirm That Musk Lied About Driving Range and that he Manipulated Tesla to Lie Too

111. Musk's deception was enormously successful. In a highly competitive industry, Tesla became the market leader. That was only possible through Musk's campaign of deception. Most consumers won't consider buying an EV unless they can get at least 300 miles out of a single charge, as Tesla's own market data showed.[45] So if Musk had been honest about vehicle ranges, he would have made billions less.

112. Multiple sources have begun to confirm the extent of Musk's lies. In January 2023, the Society of Automotive Engineers released a report after testing several Tesla models. The report found Tesla's listed driving ranges are overstated by an average of 26%. Thus, based on Tesla's range misrepresentations, a Model S Plaid owner could reasonably decide to drive from San Francisco to Los Angeles on a full charge, but would be left stranded approximately 85 miles short of the destination.

113. Then, on July 27, 2023, Reuters published a special report describing Musk's practice of intentionally inflating the range of Tesla vehicles.[46]

114. Musk himself has acknowledged the fraud. After the South Korean Fair Trade Commission (KFTC) fined Tesla over $2.2 million for overstating the range of its vehicles, along with lying about the performance of its Superchargers (stations that the company installed for owners to pay to recharge their car "up to 200 miles of range in just 15 minutes"), Musk said in a June 19, 2023 post on Tesla's Korean website: "From August 2019 to December 2022, we violated the 'Fair Labeling and Advertising Act' by engaging in false,

---

[45] Randall, *supra* note 1.
[46] Steve Stecklow and Norihiko Shirouzu, *Tesla Created Secret Team to Suppress Thousands of Driving Range Complaints,* REUTERS (July 24, 2023), https://www.reuters.com/investigates/ special-report/tesla-batteries-range/.

exaggerated, and deceptive advertising activities in manufacturing, importing, and selling our electric vehicles.  We received a corrective order from the KFTC."[47]

115.    Additionally, the EPA is currently investigating Tesla and has cut the official range estimates for the Model S, Model Y and Model X.  The Department of Justice is likewise investigating Tesla's claims about driving ranges.  Tesla has acknowledged that the DOJ's investigation may have a "material adverse impact on our business."

116.    In any event, as a result of these and other events, in January 2024, Tesla adjusted the advertised ranges for most of its vehicles—for example, reducing the Model Y Long Range by 20 miles, the Model S Plaid by 37 miles, and the Model X Plaid by 7 miles.[48] Tesla separately lowered the Model 3 Long Range in November 2023 from 358 to 333 miles. Tesla gave no explanation for doing so, because the only explanation was that Musk and the company had previously lied about the vehicles' true ranges.

117.    Tesla likewise quietly reduced the stated ranges in the range meters for many vehicles via a software update, again without explanation.

118.    Even now, however, Musk continues to manipulate Tesla to overstate vehicle ranges.  Both the advertised ranges and the range meters continue to be deceptively inflated even though reduced from prior levels.

---

[47] Jasmine Choi, *Tesla Announces 'Exaggerated Advertising' Rectification Measures after 6 Months*, BUSINESSKOREA (June 20, 2023), https://www.businesskorea.co.kr/news/articleView.html?idxno=116738.

[48] Jess Weatherbed, *Tesla lowers Model Y, S, and X range estimations following exaggeration complaints*, THE VERGE (Jan. 5, 2024), https://www.theverge.com/2024/1/5/24026367/tesla-lowers-range-estimations-model-x-s-y-mileage-exaggeration.

119.     The publicity of Musk's misconduct has damaged the market value of Tesla vehicles.  Prices of Tesla vehicles fell by more than 30% on certain models, further injuring consumers who purchased misrepresented vehicles before the price reductions.

120.     Musk previously promised that "if you buy a Tesla today, I believe you're buying an appreciating asset, not a depreciating asset." https://www.youtube.com/watch?v=dEv99vxKjVI.   But the drastic drop in Tesla vehicle prices, due to Musk's fraudulent practices, shows that this statement was unequivocally false.

### D.     Plaintiffs' Experiences

121.     **Chris Watkins**: Chris is a college soccer coach who purchased a Tesla in 2020 in the state of Washington and now resides in Massachusetts.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Chris known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

122.     **Eric Day**: Eric purchased a Tesla in Massachusetts in 2021.   His vehicles' driving range is far less than their advertised ranges and far less than the ranges displayed on the range meters when fully charged.   Had Eric known the cars' range was exaggerated and that Musk manipulated the range meters to show a false range, he would not have purchased the vehicle or would have paid considerably less.

123.     **Global Lease Group Inc.** is a Massachusetts company owned by Massachusetts resident Sham Sahni.   Global Lease Group purchased a Tesla in 2022 in Massachusetts.   The vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Global Lease Group

known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, it would not have purchased the vehicle or would have paid considerably less.

124. **Giorgio Petruzziello**: Giorgio purchased a Tesla in 2022 in New Hampshire.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Giorgio known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

125. **Prudhvi Samudrala**: Prudhvi is a software engineer who purchased a Tesla in 2021 in Illinois.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Prudhvi known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

126. **Drew Talreja**: Drew purchased a Tesla in 2022 while he was a Kentucky resident.  His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Drew known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

127. **William Wilson:** William is the chief executive of a small business who purchased a Tesla in 2021 in Florida.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had William known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

128.   **Karen Kyutukyan**: Karen, who goes by Gary, is a sales professional who purchased a Tesla in 2021 in California.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Karen known the car's range was exaggerated and that Musk manipulated the range meter to show a false range, he would not have purchased the vehicle or would have paid considerably less.

129.   **Rajeev Talreja**: Rajeev purchased a Tesla in New York in 2020 and another in Florida in 2023.   His vehicles' driving range is far less than their advertised ranges and far less than the ranges displayed on the range meters when fully charged.   Had Rajeev known the cars' range was exaggerated and that Musk manipulated the range meters to show a false range, he would not have purchased the vehicle or would have paid considerably less.

130.   **Kris Nathan**: Kris purchased a Tesla in 2023 in New Jersey.   His vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Kris known the car's range was exaggerated and that Musk manipulated the range meters to show a false range, he would not have purchased the vehicle or would have paid considerably less.

131.   **Eduard Chenette**: Eduard purchased Teslas in Maine within the limitations period.   His vehicles' driving ranges are far less than their advertised ranges and far less than the ranges displayed on their range meters when fully charged.   Had Eduard known the cars' range were exaggerated and that Musk manipulated the range meters to show false ranges, he would not have purchased the vehicles or would have paid considerably less.

132. **Walid Yassir**: Walid purchased a Tesla in Michigan in 2018.   His vehicle's driving range is far less than their advertised ranges and far less than the ranges displayed on the range meters when fully charged.   Had Walid known the car's range was exaggerated and that Musk manipulated the range meters to show a false range, he would not have purchased the vehicle or would have paid considerably less.

133. **Varsha Luthra**: Varsha purchased a Tesla with her husband in Pennsylvania in 2023.   Her vehicle's driving range is far less than its advertised range and far less than the range displayed on the range meter when fully charged.   Had Varsha known the car's range was exaggerated and that Musk manipulated the range meters to show a false range, she would not have purchased the vehicle or would have paid considerably less.

## VI.   CLASS ACTION ALLEGATIONS

134. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

135. Plaintiffs seek to represent a class of all persons in the United States who purchased or leased a new or used Tesla subject to a "Motor Vehicle Order Agreement" with the same or substantially similar terms as the Plaintiffs in this matter and did not opt out of the arbitration term in that agreement within the applicable statutes of limitations preceding the filing of this action through the date of certification.

136. Plaintiffs also seek to represent subclasses of all persons and/or consumers in the states in which Plaintiffs purchased their Teslas who purchased a new or used Tesla subject to a "Motor Vehicle Order Agreement" with the same or substantially similar terms as the Plaintiffs in this matter and did not opt out of the arbitration term in that agreement

within the applicable statutes of limitations preceding the filing of this action through the date of certification.

137.    Excluded from the Classes are (i) Elon Musk; (ii) any entity in which Elon Musk has a controlling interest; (iii) the judicial officer(s) to whom this action is assigned; and (iv) the immediate family members, legal representatives, heirs, successors, or assigns of any party excluded under (i)–(iii).

138.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and to add additional subclasses before this Court determines whether certification is appropriate.

139.    This action satisfies the numerosity, commonality, typicality, predominance, adequacy, and superiority requirements of Rule 23.

140.    As to numerosity: The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identities of whom can be readily identified by transaction records of vehicle purchases and leases, which are not currently available to Plaintiffs.

141.    As to commonality: The questions here are ones of common or general interest such that there is a well-defined community of interest among Class members.  These questions predominate over questions that may affect only individual Class members because Musk acted or failed to act on grounds generally applicable to the Class.  Such common legal or factual questions include, but are not limited to: (i) whether Musk engaged in the conduct alleged herein (*e.g.*, directly formulating and participating in a scheme to exaggerate the ranges that Tesla vehicles could travel on a single charge and to inflate the drivable ranges displayed

the range meter); (ii) whether Musk's conduct was unfair and/or deceptive, and (iii) whether Musk's conduct caused Class members harm.

142.    As to typicality: Plaintiffs' claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Musk, as described herein.  The evidence and the legal theories regarding Musk's alleged wrongful conduct committed against Plaintiffs and absent Class members are substantially the same because the challenged practices are uniform for Plaintiffs and the Class members.  For example, Musk directed his engineering team to manipulate the range meter on all Tesla vehicles.  Accordingly, in pursuing their own interest in litigating the claims, Plaintiffs will also serve the interests of the Class.

143.    As to predominance: This matter is properly maintained as a class action under Rule 23 because the common questions of law and fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members.

144.    As to adequacy: Plaintiffs are adequate representatives of the Class pursuant to Rule 23 in that he is a Tesla owner and has suffered damages because of Musk's deceptive practices.  Additionally, (i) Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated; (ii) Plaintiffs have retained competent counsel experienced in litigating class actions; (iii) there is no conflict of interest between Plaintiffs and the unnamed members of the Class; (iv) Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and (v) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and address the legal issues associated with this type of litigation.

145.     As to superiority: Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit the numerous Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.  Class action treatment will also permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against a wealthy defendant.

146.     For these reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**VIOLATIONS OF THE MASSACHUSETTS**
**CONSUMER PROTECTION ACT**
**Mass. Gen. Laws ch. 93A, § 11**

147.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

148.     Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members bring this cause of action under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("MCPA").  The MCPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

149.     Plaintiff Global Lease Group, Inc., the Massachusetts Business Consumer Class members, and Musk are "persons" as defined by the MCPA.  Mass. Gen. Laws ch. 93A, § 1, and at all relevant times were engaged in trade or commerce.

150.     At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

151.    As set forth above, Musk engaged in unfair and deceptive acts in violation of the MCPA, including by fraudulently misleading Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members.  Specifically, Musk violated the MCPA, including by:

- Formulating and implementing a scheme to misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

152.    Musk's misrepresentations and omissions were material because they impacted central functions of Tesla vehicles, such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

153.    Musk was under a duty to inform Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members about the true nature and quality of vehicle ranges.

154.    Exaggerating the range, failing to disclose that the range can be reduced by normal temperature fluctuations, and manipulating the range meters to display a false range were deceptive and misleading and would influence a reasonable business consumer's decision to purchase a Tesla.

155.    An objectively reasonable person engaged in business would have been deceived by the above-described acts and omissions.

156.    Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members suffered financial damages as a result of said unlawful conduct.  Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

157.    Had Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations can dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

158.    As a direct and proximate result of Musk's violations of the MCPA, Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members have suffered injury-in-fact and/or actual damage.

159.    Musk's unfair and deceptive practices towards Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members occurred primarily and substantially within the Commonwealth of Massachusetts.

160.    Musk's deceptive acts were willful or knowing violations of the MCPA. Therefore, Plaintiff Global Lease Group, Inc. and the Massachusetts Business Consumer Class members are entitled to up to three but not less than two times actual damages.

161.    The Massachusetts Business Consumer Class Members seek actual damages and/or statutory damages, multiple actual damages, and attorneys' fees and costs and all other relief allowed under Massachusetts law.

## COUNT II
## VIOLATIONS OF THE MASSACHUSETTS
## CONSUMER PROTECTION ACT
### Mass. Gen. Laws ch. 93A, § 9

163.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

164.    Plaintiff Eric Day brings this cause of action on behalf of members of the Massachusetts Consumer Class pursuant to the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("MCPA").  The MCPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

165.    Plaintiff Eric Day and the Massachusetts Consumer Class Members and Musk are "persons" as defined by the MCPA.  Mass. Gen. Laws ch. 93A, § 1.

166.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

167.    As set forth above, Musk engaged in unfair and deceptive acts in violation of the MCPA, including by fraudulently misleading Plaintiff Eric Day and the Massachusetts Consumer Class members.  Specifically, Musk violated the MCPA, including by:

- Formulating and implementing a scheme to misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

53

168.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

169.    Musk was under a duty to inform Plaintiff Eric Day and the Massachusetts Class members about the true nature and quality of vehicle ranges.

170.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

171.    An objectively reasonable consumer would have been deceived by the above-described acts and omissions.  Plaintiff Eric Day and the Massachusetts Consumer Class members suffered financial damages as a result of said unlawful conduct.  The Massachusetts Class members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

172.    Had Plaintiff Eric Day and the Massachusetts Consumer Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations can dramatically reduce the ranges of those vehicles, and that the range meters displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

173.    As a direct and proximate result of Musk's violations of the MCPA, Plaintiff Eric Day and the Massachusetts Consumer Class members have suffered injury-in-fact and/or actual damage.

174.    Plaintiff Eric Day provided the required written demand to Defendants under the MCPA, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, more than 30 days prior to filing this complaint. Defendants responded without making a written tender of settlement.

175.    Musk's unfair and deceptive acts were willful or knowing violations of the MCPA. In addition, Musk's failure to make a timely and reasonable written tender of settlement upon demand was in bad faith with knowledge that the practices complained of violated Section 2 of the MCPA, Plaintiff Eric Day and the Massachusetts Consumer Class Members are therefore entitled to up to three but not less than two times actual damages or twenty-five dollars, whichever is greater.

176.    Plaintiff Eric Day and the Massachusetts Consumer Class Members seek actual damages and/or statutory damages, multiple actual damages, and attorneys' fees and costs and all other relief allowed under Massachusetts law.

## COUNT III
## VIOLATIONS OF THE NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### N.H. Rev. Stat. §§ 358-A:1. *et seq.*

177.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

178.    Plaintiff Giorgio Petruzziello brings this cause of action on behalf of members of the New Hampshire Class pursuant to the New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. § 358-A:1, *et seq.*

179.    Plaintiff Giorgio Petruzziello, the New Hampshire Class, and Musk are "person[s]" under the NHCPA.  N.H. Rev. Stat. § 358-A:1.

180.   At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.  N.H. Rev. Stat. § 358-A:1.

181.   The NHCPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) [r]epresenting that goods or services have … characteristics, … uses, benefits or quantities that they do not have;" "(VII) [r]epresenting that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) [a]dvertising goods or services with intent not to sell them as advertised."  N.H. Rev. Stat. § 358-A:2.

182.   Musk violated the NHCPA by engaging in the conduct described above, which constitutes unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.  Specifically, Musk violated the NHCPA by:

- Formulating and implementing a scheme to misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

183.   Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

184.    Musk was under a duty to inform the New Hampshire Class members about the true nature and quality of vehicle ranges.

185.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

186.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Giorgio Petruzziello and the New Hampshire Class members suffered financial damages as a result of said unlawful conduct.  Plaintiff Giorgio Petruzziello and the New Hampshire Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

187.    Had Plaintiff Giorgio Petruzziello and the New Hampshire Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

188.    As a direct and proximate result of Musk's violations of the NHCPA, Plaintiff Giorgio Petruzziello and the New Hampshire Class members have been injured in an amount to be proven at trial.  Alternatively, Plaintiff Giorgio Petruzziello and the New Hampshire Class members are entitled to a refund for the amount they paid for their Tesla vehicles.

190.    Plaintiff Giorgio Petruzziello, on behalf of himself and the New Hampshire Class members, seeks actual damages or $1,000, whichever is greater, treble damages, punitive damages, a refund, and attorneys' fees and costs, and all other relief allowed under New Hampshire law.  N.H. Rev. Stat. § 358-A:10.

**COUNT IV**
**VIOLATIONS OF THE MAINE**
**UNFAIR TRADE PRACTICES ACT**
**5   M.R.S.A § 205-A** *et seq.*

191.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

192.    Plaintiff Eduard Chenette brings this cause of action on behalf of members of the Maine Class pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.* ("MUTPA").

193.    Plaintiff Eduard Chenette and the Maine Class members are persons who purchased Teslas primarily for personal, family, or household purposes within the meaning of Section 213(1) of MUTPA.

194.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce as defined by Section 206(3) of the MUTPA.

195.    The MUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207.

196.    Musk engaged in unlawful trade practices including, inter alia: (1) representing that Teslas have characteristics, benefits, and qualities that it does not have; (2) representing that Teslas are of a particular standard and quality when they are not; (3) advertising Teslas with an intent not to sell them as advertised; and (4) otherwise engaging in conduct likely to deceive.

197.    As set forth above, Musk engaged in unfair and deceptive acts in violation of the MUTPA, including by fraudulently misleading Plaintiff Eduard Chenette and the Maine Class members.  Specifically, Musk violated the MUTPA, including by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

198.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

199.    Musk was under a duty to inform Plaintiff Eduard Chenette and the Maine Class members about the true nature and quality of vehicle ranges.

200.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

201.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Eduard Chenette and the Maine Class members suffered financial damages as a result of said unlawful conduct. Plaintiff Eduard Chenette and

the Maine Class members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

202.    Had Plaintiff Eduard Chenette and the Maine Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

203.    As a direct and proximate result of Musk's violations of the MUTPA, Plaintiff Eduard Chenette and the Maine Class members have suffered injury-in-fact and/or actual damage.

204.    The unfair and deceptive acts and practices complained of herein were not reasonably avoidable by consumers.

205.    Plaintiff Eduard Chenette provided the required written demand for relief to Defendants under the MUTPA, identifying Defendants and reasonably describing the unfair and deceptive acts and practices at issue, mailed more than 30 days prior to filing this complaint.  Defendants failed to make a written tender of settlement or an offer of judgment.

206.    Musk's acts and practices, as outlined above, were willful and knowing.

207.    Plaintiff Eduard Chenette and the Maine Class are entitled to recover actual damages in an amount to be established at trial, restitution, restitution by way of full refunds of the purchase price for all their purchases of Teslas and any other equitable relief, which the Court determines to be necessary and proper pursuant to Section 213(1) of the MUTPA.

208.    Furthermore, in accordance with Section 213(2) of the MUTPA, Musk is liable to Plaintiff Eduard Chenette and the Maine Class for reasonable attorneys' fees and costs incurred in connection with this action.

209.    The Maine Class Members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under Maine law.

**COUNT V**
**VIOLATIONS OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICE ACT**
**Fla. Stat. § 501.201, et seq.**

210.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

211.    Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members bring this cause of action pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "FDUTPA").  The stated purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* § 501.202(2).

212.    Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by FDUTPA.  *See id.* § 501.203(7)-(8).

213.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

214.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 501.204(1).

215.    Musk violated FDUTPA by engaging in the conduct described above, which constitutes unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

216.    In violation of FDUTPA, Musk employed fraud, deception, false promise, and the knowing concealment, suppression, or omission of material facts in the sale and advertisement of Tesla vehicles in the State of Florida.  Specifically, Musk violated FDUTPA, including by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

217.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

218.    Musk was under a duty to inform the Florida Class members about the true nature and quality of vehicle ranges.

219.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

220.     An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members suffered financial damages as a result of said unlawful conduct.  Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

221.     Had Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

222.     As a direct and proximate result of Musk's violations of the FDUTPA, Plaintiffs William Wilson, Rajeev Talreja, and the Florida Class Members have been injured in an amount to be proven at trial.

223.     Plaintiffs William Wilson and Rajeev Talreja, on behalf of themselves and the Florida Class Members, seek actual damages, punitive damages, attorneys' fees and costs, and all other relief allowed under Florida law.

### COUNT VI
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS § 505/1

224.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

225.    Plaintiff Prudhvi Samudrala and the Illinois Class Members bring this cause of action pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 ("ICFA").

226.    The ICFA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, including among others, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 Ill. Comp. Stat. § 505/2.  It further prohibits suppliers from representing that their goods are of a particular quality or grade that they are not.

227.    Plaintiff Prudhvi Samudrala and the Illinois Class Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

228.    Musk and the Musk Trust are "person[s]" as defined in 815 Ill. Comp. Stat. § 505/1(c).

229.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

230.    Tesla vehicles are "merchandise" as defined in 815 Ill. Comp. Stat. S 505/1(b).

231.    Musk engaged in unfair or deceptive acts or practices as defined in 815 Ill. Comp. Stat. § 505/2, including by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

232.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

233.    Musk was under a duty to Plaintiff Prudhvi Samudrala and the Illinois Class members about the true nature and quality of vehicle ranges.

234.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

235.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Prudhvi Samudrala and the Illinois Class Members suffered financial damages as a result of said unlawful conduct.  Plaintiff Prudhvi Samudrala and the Illinois Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

236.    Had Plaintiff Prudhvi Samudrala and the Illinois Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

237.    As a direct and proximate result of Musk's violations of the ICFA, Plaintiff Prudhvi Samudrala and the Illinois Class Members have been injured in an amount to be proven at trial.

238.    Plaintiff Prudhvi Samudrala, on behalf of himself and the Illinois Class Members, seeks actual damages, punitive damages, attorneys' fees and costs, and all other relief allowed under Illinois law.

## COUNT VII
## VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 349
## FOR UNFAIR AND DECEPTIVE TRADE PRACTICES
## N.Y. Gen. Bus. Law § 349

239.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

240.    Plaintiff Rajeev Talreja and the New York Class Members bring this cause of action under N.Y. Gen. Bus. Law § 349 ("GBL § 349").

241.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

242.    The sale and distribution of the Tesla vehicles in New York was a consumer-oriented act within the meaning of GBL § 349.

243.    GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

244.    Musk engaged in unfair or deceptive acts or practices as defined in GBL § 349, including by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

245. Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

246. Musk was under a duty to inform Plaintiff Rajeev Talreja and the New York Class Members about the true nature and quality of vehicle ranges.

247. Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

248. An objectively reasonable person would have been deceived by the above-described acts and omissions. Plaintiff Rajeev Talreja and the New York Class Members suffered financial damages as a result of said unlawful conduct. Plaintiff Rajeev Talreja and the New York Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

249. Had Plaintiff Rajeev Talreja and the New York Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range

meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

250. As a direct and proximate result of Musk's violations of the GBL § 349, Plaintiff Rajeev Talreja and the New York Class Members have been injured in an amount to be proven at trial.

251. Plaintiff Rajeev Talreja, on behalf of himself and the New York Class Members, seeks actual damages, punitive damages, attorneys' fees and costs, and all other relief allowed under New York law.

**COUNT VIII**
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 350**
**FOR FALSE ADVERTISING**

252. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

253. Plaintiff Rajeev Talreja and the New York Class Members bring this cause of action pursuant to GBL § 350, which prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service[.]"  The statute defines false advertising as "advertising, including labeling, of a commodity . . . [that is] misleading in a material respect." N.Y. Gen. Bus. Law § 350-a.

254. At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

255. Musk's conduct, described above, qualifies as "false advertising" within the meaning of GBL § 350 because he publicly disseminates materially misleading statements, labeling, and information regarding the capabilities, including the range, of Tesla vehicles through advertising, marketing, labeling, packaging, and other representations.

256.     Musk violated GBL § 350 by overstating the range of Tesla vehicles in online advertisements, failing to disclose that normal temperature fluctuations reduce that range, and that he manipulated the range meter to display a false range.

257.     Musk's misrepresentations and omissions were material because they impact central functions of electric vehicles, like the range they could travel on a single charge and the operation of the vehicles' range meter.  Had Plaintiff Rajeev Talreja and the New York Class Members known that the range was exaggerated, that normal temperature fluctuations dramatically reduce the range, and that the range meter was manipulated to display a false range, they would not have purchased the Tesla vehicles or paid less for them.

258.     Plaintiff Rajeev Talreja and the New York Class Members have suffered lost or diminished use, enjoyment, and utility of their Tesla vehicles resulting from Musk's violations of GBL § 350.

259.     Through this conduct, Musk has engaged in false advertising and violated GBL § 350, and such violations injured Plaintiff Rajeev Talreja and the New York Class Members. Plaintiff Rajeev Talreja, on behalf of himself and the New York Class members, seeks actual damages or $500 per violation, whichever is greater, by Musk.

260.     Through his conduct, Musk willfully or knowingly engaged in false advertising, including through his omissions.  Accordingly, a punitive award is appropriate, such that the damages be increased in an amount three times actual damages up to ten thousand dollars ($10,000), for each of Musk's violations.

**COUNT IX**
**VIOLATIONS OF THE PENNSYLVANIA**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 P.S. § 201-1**

261.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

262.    Plaintiff Varsha Luthra brings this cause of action on behalf of members of the Pennsylvania Class pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, including among others, "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another," "[r]epresenting that goods or services have . . . characteristics . . . that they do not have and "[a]dvertising goods or services with intent not to sell them as advertised[.]" 73 P.S. § 201-2

263.    Plaintiff Varsha Luthra and the Pennsylvania Class Members and Musk are "person[s]" as defined by the statute.

264.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce.

265.    Musk engaged in unfair or deceptive acts or practices as defined in 73 P.S. § 201-2, including by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

266.   Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

267.   Musk was under a duty to inform Plaintiff Varsha Luthra and the Pennsylvania Class members about the true nature and quality of vehicle ranges.

268.   Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

269.   An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Varsha Luthra and the Pennsylvania Class Members suffered financial damages as a result of said unlawful conduct.  Plaintiff Varsha Luthra and the Pennsylvania Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

270.   Had Plaintiff Varsha Luthra and the Pennsylvania Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

271.    As a direct and proximate result of Musk's violations of 73 P.S. § 201, Plaintiff Varsha Luthra and the Pennsylvania Class Members have been injured in an amount to be proven at trial.

272.    Because Musk's deceptive acts were willful or knowing violations of 73 P.S. § 201, Plaintiff Varsha Luthra and the Pennsylvania Class Members are entitled to up to three times actual damages sustained and not less than $100, whichever is greater.  73 P.S. § 201-9.2.  Alternatively, Plaintiff Varsha Luthra and the Pennsylvania Class Members are entitled to up to actual damages or $100, whichever is greater.

273.    Plaintiff Varsha Luthra and the Pennsylvania Class Members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under Pennsylvania law.

## COUNT X
## VIOLATIONS OF THE NEW JERSEY
## CONSUMER FRAUD ACT
## N.J. STAT. § 56:8-1

274.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

275.    This cause of action is brought on behalf of members of the New Jersey Class pursuant to the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.* ("NJCFA").

276.    The New Jersey Class are "person[s]" and "consumer[s]" and Musk and the Musk Trust are "Person[s]" engaged in the sale of merchandise.  N.J. Stat. § 56:8-1(d), (e).

277.    NJCFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or

real estate, or with the subsequent performance of such person aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice" N.J. Stat. § 56:8-2.

278.   Musk violated NJCFA by engaging in the conduct described above, which constitutes unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. Specifically, Musk violated the NJCFA by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

279.   Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

280.   Musk was under a duty to inform the New Jersey Class members about the true nature and quality of vehicle ranges.

281.   Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

282.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  The New Jersey Class members suffered financial damages as a result of said unlawful conduct.  The New Jersey Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

283.    The New Jersey Class members have been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

284.    As a direct and proximate result of Musk's violations of the NJCFA, the New Jersey Class members have been injured in an amount to be proven at trial.  The New Jersey Class members are entitled to a refund for the amount they paid for their Tesla vehicles.  N.J. STAT. § 56:8-2.12.

285.    The New Jersey Class members seek actual damages, statutory damages, punitive damages, a refund, attorneys' fees and costs, and all other relief allowed under New Jersey law.

**COUNT XI**
**VIOLATIONS OF THE CALIFORNIA**
**CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750**

286.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

287.    Plaintiff Karen Kyutukyan brings this cause of action on behalf of members of the California Class pursuant to the California Consumer Legal Remedies Act ("CLRA"). Cal. Civ. Code § 1750.

288.    Plaintiff Karen Kyutukyan and the California Class members are "consumers" as defined by the CLRA.

289.    Musk is a "person[s]" as defined by the CLRA.

290.    The CLRA prohibits unfair or deceptive acts or practices in the sale or lease of goods, including among others, "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another," "[r]epresenting that goods or services have . . . characteristics . . . that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised[.]" Cal. Civ. Code § 1770.

291.    Musk engaged in unfair or deceptive acts or practices as defined by the CLRA, including:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

292.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

293.   Musk was under a duty to inform the California Class members about the true nature and quality of vehicle ranges.

294.   Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

295.   An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Karen Kyutukyan and the California Class Members suffered financial damages as a result of said unlawful conduct.  Plaintiff Karen Kyutukyan and the California Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

296.   Had Plaintiff Karen Kyutukyan and the California Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

297.   Plaintiff Karen Kyutukyan provided the required written notice to Defendants under the CLRA, identifying the claimant and reasonably describing the methods, acts, or practices declared unlawful by the CLRA, more than 30 days prior to filing this complaint. Defendants responded without offering an appropriate correction, repair, replacement, or other remedy.

298.    As a direct and proximate result of Musk's violations of CLRA, Plaintiff Karen Kyutukyan and the California Class Members have been injured in an amount to be proven at trial.

299.    Plaintiff Karen Kyutukyan and the California Class Members are entitled to actual damages, not less than $1,000 and punitive damages.

300.    Plaintiff Karen Kyutukyan and the California Class Members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under California law.

**COUNT XII**
**VIOLATIONS OF THE CALIFORNIA**
**UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200**

301.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

302.    Plaintiff Karen Kyutukyan and the California Class Members bring this cause of action pursuant to the California Unfair Competition Law ("UCL"), which prohibits "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

303.    As set forth above, Musk engaged in unfair competition and "unfair, deceptive, untrue or misleading advertising," in violation of the UCL, including by exaggerating the range of Tesla vehicles, failing to disclose that the range was dramatically reduced by normal temperature fluctuations, and manipulating the range meter on those vehicles to display a false range.

304.    Musk's practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, and California Commercial Code § 2313, various other laws as described herein.

305.    As a direct and proximate result of Musk's violations of the Cal. Bus. & Prof. Code § 17200, Plaintiff Karen Kyutukyan, on behalf of herself and the California Class Members have been injured in an amount to be proven at trial.

306.    Plaintiff Karen Kyutukyan, on behalf of herself and the California Class Members, seeks actual damages and/or restitutionary disgorgement of all monies and revenues generated as a result of Musk's violation of the UCL, along with all other relief allowed under the UCL and California law.

**COUNT XIII**
**VIOLATIONS OF THE CALIFORNIA**
**FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500,** *et seq.*

307.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

308.    Plaintiff Karen Kyutukyan and the California Class Members bring this cause of action pursuant to California's False Advertising Law ("FAL"), which makes it unlawful for "any person,... with intent directly or indirectly to dispose of real or personal property... or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property... or concerning any circumstance or

matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

309.    As set forth above, Musk made, caused to be made, and disseminated through California and the United States, through advertising, marketing, publications, public outcry, and proclamation, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Musk should have known to be untrue and misleading to consumers, including Plaintiffs and other Class members.

310.    Musk's practices are unlawful because they violate Cal. Bus. & Prof. Code § 17500.

311.    A reasonable person would rely on Musk's misrepresentations and material omissions.

312.    As a direct and proximate result of Musk's violations of the Cal. Bus. & Prof. Code § 17500, Plaintiff Karen Kyutukyan, on behalf of herself and the California Class Members have been injured in an amount to be proven at trial.

313.    Plaintiff Karen Kyutukyan, on behalf of herself and the California Class Members, seeks actual damages and/or restitutionary disgorgement of all monies and revenues generated as a result of Musk's violation of the FAL, along with all other relief allowed under the FAL and California law.

## COUNT XIV
## VIOLATIONS OF THE WASHINGTON
## CONSUMER PROTECTION ACT
### Wash. Rev. Code § 19.86.010, *et seq.*

314.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

315.    Plaintiff Chris Watkins and the Washington Class Members bring this cause of action under the Washington Consumer Protection Act ("Washington CPA").  Wash. Rev. Code § 19.86.010, *et seq*.

316.    Plaintiff Chris Watkins, the Washington Class Members, and Musk are "persons[s]" within the meaning of Wash. Rev. Code § 19.86.010(2).

317.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce within the meaning of the Washington CPA.

318.    The Washington CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

319.    Musk engaged in unfair or deceptive acts or practices that violated the Washington CPA by:

- Formulating and implementing a scheme to  misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

320.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

321.    Musk was under a duty to inform Plaintiff Chris Watkins and the Washington Class members about the true nature and quality of vehicle ranges.

322.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

323.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Chris Watkins and the Washington Class Members suffered financial damages as a result of said unlawful conduct.  Plaintiff Chris Watkins and the Washington Class Members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

324.    Had Plaintiff Chris Watkins and the Washington Class Members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations dramatically reduce the ranges of those vehicles, and that the range meter displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

325.    As a direct and proximate result of Musk's violations of the Washington CPA, Plaintiff Chris Watkins and the Washington Class Members have been injured in an amount to be proven at trial.

326.    Because Musk's deceptive acts were willful or knowing violations of the Washington CPA, Plaintiff Chris Watkins and the Washington Class Members are entitled to up to three times actual damages sustained.  Wash. Rev. Code § 19.86.090.

327.    Plaintiff Chris Watkins and the Washington Class Members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under Washington law.

## COUNT XV
## VIOLATIONS OF THE KENTUCKY
## CONSUMER PROTECTION ACT
### Ky. Rev. Stat. § 367.110, *et seq.*

328.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

329.    Plaintiff Drew Talreja and the Kentucky Class members bring this action pursuant to the Kentucky Consumer Protection Act ("Kentucky CPA"), which prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce ..." Ky. Rev. Stat. § 367.170(1).

330.    Plaintiff Drew Talreja, the Kentucky Class Members, and Musk are "persons[s]" within the meaning of Ky. Rev. Stat. § 367.170(1).

331.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce within the meaning of the Kentucky CPA.  Ky. Rev. Stat. Ann. § 367.110(2).

332.    Musk engaged in unfair, false, misleading, or deceptive acts or practices that violated the Kentucky CPA by:

- Formulating and implementing a scheme to misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

333. Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

334. Musk was under a duty to inform Plaintiff Drew Talreja and the Kentucky Class members about the true nature and quality of vehicle ranges.

335. Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

336. An objectively reasonable person would have been deceived by the above-described acts and omissions. Plaintiff Drew Talreja and the Kentucky Class members suffered financial damages as a result of said unlawful conduct. Plaintiff Drew Talreja and the Kentucky Class members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

337. Had Plaintiff Drew Talreja and the Kentucky Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations can dramatically reduce the ranges of those vehicles, and that the range meters displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

338.    As a direct and proximate result of Musk's violations of the Kentucky CPA, Plaintiff Drew Talreja and the Kentucky Class members have suffered injury-in-fact and/or actual damage.

339.    Plaintiff Drew Talreja and the Kentucky Class members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under Kentucky law.

**COUNT XVI**
**VIOLATIONS OF THE MICHIGAN**
**CONSUMER PROTECTION ACT**
**Mich. Comp. Laws § 445.901, *et. seq.***

340.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as fully set forth herein.

341.    Plaintiff Walid Yassir and the Michigan Class members bring this action pursuant to the Michigan Consumer Protection Act ("Michigan CPA"), which prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]"  Mich. Comp. Laws Ann. § 445.903.

342.    Plaintiff Walid Yassir and the Michigan Class members, and Musk are "persons[s]" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

343.    At all relevant times, Musk and the Musk Trust were engaged in trade or commerce within the meaning of the Michigan CPA.  Mich. Comp. Laws § 445.902(1)(g).

344.    Musk engaged in unfair, false, misleading, or deceptive acts or practices that violated the Michigan CPA by:

- Formulating and implementing a scheme to misrepresent the ranges that Tesla vehicles can travel on a single charge;

- Formulating and implementing a scheme to omit disclosing to customers that normal temperature fluctuations can dramatically reduce the driving ranges of Tesla vehicles; and

- Formulating and implementing a scheme for Tesla vehicle range meters to misrepresent driving ranges.

345.    Musk's misconduct was material because it impacted central functions of Tesla vehicles such as the ranges they can travel on a single charge and the operation of the vehicles' range meters.

346.    Musk was under a duty to inform Plaintiff Walid Yassir and the Michigan Class members about the true nature and quality of vehicle ranges.

347.    Exaggerating vehicle ranges, failing to disclose that the ranges were affected by normal temperature fluctuations, and manipulating the range meters to display false ranges were deceptive and misleading and would influence a reasonable consumer's decision to purchase a Tesla.

348.    An objectively reasonable person would have been deceived by the above-described acts and omissions.  Plaintiff Walid Yassir and the Michigan Class members suffered financial damages as a result of said unlawful conduct.  Plaintiff Walid Yassir and the Michigan Class members were further injured when some of the unlawful practices were uncovered, which drove down the values of Tesla vehicles.

349.    Had Plaintiff Walid Yassir and the Michigan Class members been adequately informed that the Tesla vehicles' advertised ranges were exaggerated, that normal temperature fluctuations can dramatically reduce the ranges of those vehicles, and that the

range meters displayed false ranges, they would have taken steps to avoid damages by not purchasing the vehicles or paying less for the vehicles.

350.    As a direct and proximate result of Musk's violations of the Michigan CPA, Plaintiff Walid Yassir and the Michigan Class members have suffered injury-in-fact and/or actual damage.

351.    Plaintiff Walid Yassir and the Michigan Class members seek actual damages, statutory damages, attorneys' fees and costs, and all other relief allowed under Michigan law.

### COUNT XVII
### Fraud
### (On behalf of Plaintiffs and the Classes)

352.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

353.    Musk engaged in the misconduct described above, which constituted material misrepresentations and omissions of fact.

354.    Musk's misconduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the vehicles have a much greater vehicle range than they do.

355.    Plaintiffs and the members of the nationwide class considered the Tesla vehicles' driving range to be an important factor when purchasing their Tesla vehicles. The vehicle's advertised range is material to the average, reasonable consumer.

356.    Plaintiffs and the members of the nationwide class were actually misled and deceived and were induced by Musk to purchase the vehicles. Had Musk truthfully stated the vehicle's range, Plaintiffs the members of the nationwide class would have either not purchased the vehicles, or else would have paid substantially less for them.

357.    As a result of Musk's conduct, Plaintiffs and the members of the nationwide class have been damaged in an amount to be determined at trial.

## COUNT XVIII
## Unjust Enrichment
## (On behalf of Plaintiffs and the Classes)

358.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

359.    Plaintiffs and the members of the nationwide class conferred a benefit on Musk by purchasing their vehicles.

360.    Musk had knowledge that this benefit was conferred upon him.

361.    Because of Musk's wrongful acts and misrepresentations and omissions described above, Plaintiffs and the nationwide class members paid a higher price for their vehicles than the vehicles' true value and Musk obtained money which rightfully belongs to Plaintiffs and the members of the nationwide class.

362.    Musk derived benefits from those Plaintiffs and the nationwide class members' vehicle purchases.

363.    Musk has been unjustly enriched at the expense of Plaintiffs and the members of the nationwide class, and his retention of this benefit under the circumstances would be inequitable.

364.    Plaintiffs seek an order requiring Musk to make restitution to Plaintiffs and the members of the nationwide class.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Claimants respectfully requests that the Court:

    a.    Determine that the claims alleged herein may be maintained as a class action under Federal Rule of Civil Procedure 23, and issue an order certifying the class defined above;

    b.    Appoint Plaintiffs as the representative of the Classes and their counsel as Class counsel;

    c.    Award all actual, general, special, incidental, statutory, punitive damages, and attorney's fees, to which Plaintiffs and the Class members are entitled;

    d.    Award injunctive relief;

    e.    Award pre-judgment and post-judgment interest on such monetary relief; and

    f.    Grant any other relief that the Court deems appropriate.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs demands a jury trial on all issues so triable.

Respectfully submitted this 26th day of August 2024.

        */s/ Ryan D. Watstein*
        WATSTEIN TEREPKA LLP
        Ryan D. Watstein (pro hac vice)
        T: 404-782-0696
        E: ryan@wtlaw.com
        Alexander D. Terepka (pro hac vice)
        T: 404-782-9821
        E: alex@wtlaw.com
        1055 Howell Mill Road, 8th Floor
        Atlanta, Georgia 30318

Kenneth D. Quat
BBO #408640
QUAT LAW OFFICES
373 Winch Street
Framingham, Massachusetts 01701
T: 508-872-1261
E: ken@quatlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of August 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein