# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————— )
CHRIS WATKINS, ERIC DAY, GLOBAL )
LEASE GROUP INC., PRUDHVI )
SAMUDRALA, WILLIAM WILSON, KAREN )
KYUTUKYAN, RAJEEV TALREJA, GIORGIO )
PETRUZZIELLO, DREW TALREJA, KRIS )
NATHAN, EDUARD CHENETTE, WALID )
WASSIR, and VARSHA LAUTHRA, on )
behalf of themselves and all )      Civil Action
others similarly situated, )        No. 24-cv-11384-PBS
 )
                    Plaintiffs, )
 )
v. )
 )
ELON R. MUSK, individually and in )
his capacity as Trustee of the )
ELON MUSK REVOCABLE TRUST DATED )
JULY 22, 2003, )
 )
                    Defendants. )
—————————————————————————— )

## MEMORANDUM AND ORDER

June 12, 2025

Saris, D.J.

## INTRODUCTION

Plaintiffs are purchasers of electric vehicles ("EVs") sold by Telsa, Inc. ("Telsa"). They bring this putative class action lawsuit seeking damages for alleged misrepresentations made by both Tesla and its Chief Executive Officer ("CEO") Elon R. Musk about the driving ranges of the company's EVs. Plaintiffs assert consumer protection claims under various state statutes and common law claims of fraud and unjust enrichment.

1

When purchasing their EVs, Plaintiffs agreed to arbitrate disputes with Tesla. Rather than name Telsa as a defendant in this action, Plaintiffs have sued Musk both in his individual capacity and in his capacity as trustee of his personal revocable trust, the Elon Musk Revocable Trust Dated July 22, 2003 ("Musk Trust").

Musk now moves to dismiss the claims against him in both capacities for lack of standing under Federal Rule of Civil Procedure 12(b)(1). In the alternative, he seeks orders compelling Plaintiffs to arbitrate their claims against him individually pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, and dismissing their claims against him in his capacity as trustee of the Musk Trust for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Finally, he moves to dismiss all claims against him for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Musk's motions to dismiss for lack of standing (Dkt. 44 and 46), **ALLOWS** Musk's motion to compel arbitration of the claims against him individually (Dkt. 48), **ALLOWS** Musk's motion to dismiss the claims against him as trustee of the Musk Trust for lack of personal jurisdiction (Dkt. 46), and **DENIES** as moot Musk's motions to dismiss for failure to state a claim (Dkts. 44 and 46).

## BACKGROUND

The Court takes the following facts from Plaintiffs' amended complaint and other evidentiary materials submitted by the parties in connection with the motions to dismiss for lack of standing and personal jurisdiction and to compel arbitration. See, e.g., Rosenthal v. Bloomingdales.com, LLC, 101 F.4th 90, 93 (1st Cir. 2024); Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 171 n.1 (1st Cir. 2021).

## I.   Scheme to Misrepresent Tesla Vehicle Ranges

Driving ranges are an important factor in a consumer's decision to buy an EV, and EVs with longer ranges sell for a premium. Most consumers will not consider buying an EV with a range below 300 miles per charge. The U.S. Environmental Protection Agency ("EPA") has promulgated regulations governing how car manufacturers estimate fuel economy and driving ranges for EVs and what information is displayed on fuel economy labels. See, e.g., 40 C.F.R. §§ 600.210-12, .310-12, .311-12.

Few, if any, Tesla EVs hit the 300-mile metric in real-world driving conditions. Plaintiffs allege that Musk and Tesla misrepresented the driving ranges of Tesla EVs in order to sell more cars. Plaintiffs also allege that many of the inflated driving ranges that Musk and Tesla promoted did not conform to EPA estimates.

### A.    Misrepresentations About Driving Ranges

Tesla spends little on traditional advertising. Instead, Musk has "used the global influence of his own persona as the primary source of Tesla's marketing," Dkt. 40 ¶ 40, including via his widely followed account on X (formerly known as Twitter).

Musk has made various false statements about the driving ranges of Tesla EVs on his X account. For example, on May 18, 2018, Musk posted falsely that the "Tesla dual motor, all-wheel drive performance Model 3" had a "310 mile Range." Id. ¶ 48. In February 2020, Musk linked to a Consumer Reports article and stated that the "Model 3 achieves 350 mile actual range vs. 310 EPA sticker in Consumer Reports testing." Id. ¶ 49 (emphasis omitted). However, Consumer Reports reported that it achieved the 350-mile range only in a Model 3 Long Range and only using abnormal driving behavior. In March 2022, Musk referenced Tesla's "400+ mile range car" in an X post even though no Tesla EV had such a range. Id. ¶¶ 52-53.

Musk made similar false statements about Tesla EVs' driving ranges in other public settings. When Musk introduced Tesla's Model Y in 2019, he claimed that the vehicle had "an actual true usable range of 300 miles." Id. ¶ 58. In an April 2020 corporate earnings call, he stated that "the real Model S range is 400 miles." Id. ¶ 57. Neither vehicle has an actual driving range as long as Musk claimed.

At Musk's direction, Tesla reported inflated driving ranges too. In February 2019, Tesla tweeted ranges for various iterations of the Model 3 without referring to EPA estimates. Tesla's website listed inflated ranges for the Model S, Model 3, and Model X that also were not qualified as EPA estimates. Tesla falsely indicated on its website that a Model S could make the 383-mile trip from San Francisco to Los Angeles on a single charge.

Some pages on Tesla's website do reference EPA estimates for driving ranges. For example, in May 2021, Tesla added a label to the 353-mile range on the Model 3's webpage that designated the figure as an EPA estimate. Elsewhere on the same page, however, Tesla claimed that a driver could "[g]o anywhere with up to 353 mi[les] of estimate range on a single charge." Id. ¶ 92. Moreover, Musk and Tesla did not disclose that the driving ranges they advertised were unachievable in real-world driving conditions and were drastically reduced in certain common weather conditions.

**B.    Rigging of Dashboard Range Meters and Response to Customer Complaints**

Plaintiffs also allege that Tesla acted at Musk's direction to bolster the exaggerated claims about its EVs' driving ranges. First, Musk instructed Tesla engineers to alter the software controlling the cars' dashboard meters, which show how far the vehicle can travel on the remaining battery charge, to display inflated driving ranges. Second, Musk implemented a procedure for

answering customer complaints about vehicle driving ranges. When a customer scheduled a service appointment, Tesla conducted a "remote diagnostic" and, whatever the result, told the customer that the vehicle was working properly. The employee also informed the customer that the stated range was a prediction rather than an actual measurement and, inaccurately, that a naturally degrading battery was the cause of the range issue.

### C.  Reports of Inflated Driving Ranges

Many owners of Tesla EVs have complained online that their vehicles did not have the driving ranges that were advertised and that their dashboard range meters were inaccurate. In January 2023, the Society of Automotive Engineers released a report concluding that Tesla's advertised driving ranges were overstated by an average of 26%. The same year, the South Korean government fined Tesla for inflating its EVs' ranges, among other misconduct. In January 2024, Tesla reduced the advertised ranges for most of its EVs and released a software update that lowered the ranges listed on the meters in many of its vehicles. Plaintiffs allege that even these reduced figures misrepresent the driving ranges of Tesla's EVs.

## II.  <u>The Musk Trust and Musk's Ownership of Tesla Stock</u>

Musk, a Texas citizen, is both Tesla's CEO and its largest shareholder. Over the past five years, he has been the beneficial owner of between 20.5% and 23.5% of Tesla stock. Plaintiffs allege

that all of Musk's Tesla stock is held by the Musk Trust and that Musk is the trust's sole trustee.[1]

As both Tesla's CEO and its largest shareholder, Musk wields significant control over the company. Musk used this control to direct Tesla to misrepresent the driving ranges of its EVs and to manipulate the range meters in its vehicles. Tesla stock increased in value due to Musk's scheme, thereby enriching the Musk Trust.

**III. Plaintiffs' Tesla Purchases and Arbitration Agreements**

Plaintiffs are twelve individuals and one company that all bought iterations of Tesla's Model X, Model Y, or Model 3 between 2018 and 2024. They made their purchases in California, Florida, Illinois, Kentucky, Maine, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Pennsylvania, or Washington. Plaintiffs allege that their EVs' driving ranges are "far less than [the] advertised range and far less than the range displayed on the range meter when fully charged." Id. ¶¶ 121-33. They also allege that they would not have purchased the vehicles, or would have paid less, had they known that the advertised driving ranges were exaggerated and that the range meters were manipulated.

---

[1] Plaintiffs have also submitted securities filings indicating that Musk's beneficial ownership of Tesla stock includes both shares held by the Musk Trust and shares issuable to Musk upon his exercise of options. The exact percentage of Tesla stock held by the Musk Trust is not relevant for present purposes.

When Plaintiffs bought their EVs, they all entered into either a Motor Vehicle Order Agreement ("Order Agreement") or a Motor Vehicle Purchase Agreement ("Purchase Agreement"). These agreements contain arbitration clauses that read in relevant part as follows:

> Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates[] (together "Tesla").
>
> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.
>
> If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.

Dkt. 50-1 at 4. The agreements also provide that their "terms . . . are governed by, and to be interpreted according to, the laws of the State in which we are licensed to sell motor vehicles that is nearest to [the purchaser's] address." Id.

## DISCUSSION

### I. Article III Standing

The Court begins with Musk's arguments concerning Plaintiffs' Article III standing to bring this lawsuit, a threshold matter that implicates subject matter jurisdiction. See Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 46

(1st Cir. 2020); <u>see also</u> <u>Hines v. Stamos</u>, 111 F.4th 551, 563-66 (5th Cir. 2024) (holding that courts cannot compel arbitration before addressing their jurisdiction); <u>Reading Health Sys. v. Bear Stearns & Co.</u>, 900 F.3d 87, 95-96 (3d Cir. 2018) (same).[2]

### A.    Legal Standard

Under Article III's case-or-controversy requirement, the plaintiff must possess standing to bring his lawsuit, <u>i.e.</u>, "a 'personal stake' in the case." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021) (quoting <u>Raines v. Byrd</u>, 521 U.S. 811, 819 (1997)). The plaintiff bears the burden of establishing standing. <u>See</u> <u>id.</u> at 430-31. To meet this burden, he "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." <u>Id.</u> at 423.

"A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" <u>Id.</u> at 431 (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992)). Thus, at the motion-to-dismiss stage, courts generally credit all well-pleaded facts in the complaint and ask

---

[2] Musk frames his argument that Plaintiffs' claims are preempted by federal law as one that also concerns this Court's jurisdiction. "Ordinary preemption" of the sort that Musk raises is, however, a defense to the merits of a claim. <u>Rhode Island v. Shell Oil Prods. Co.</u>, 35 F.4th 44, 52 n.4 (1st Cir. 2022).

whether the plaintiff has plausibly alleged the three elements of standing. See In re Fin. Oversight & Mgmt. Bd. of P.R., 110 F.4th 295, 308 (1st Cir. 2024). That said, a defendant may use a Rule 12(b)(1) motion to launch a "factual challenge" to the court's subject matter jurisdiction that contests "the accuracy (rather than the sufficiency) of jurisdictional facts asserted by the plaintiff." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). When the defendant raises a factual challenge, courts may consider extrinsic evidence submitted by the parties and resolve disputed facts relevant to the jurisdictional inquiry. See Toddle Inn Franchising, LLC v. KPJ Assocs., LLC, 8 F.4th 56, 61 n.5 (1st Cir. 2021); Valentin, 254 F.3d at 363.

**B.  Plaintiff Varsha Luthra**

Musk first argues that one named plaintiff -- Varsha Luthra -- has not suffered an injury in fact because she did not personally purchase a Tesla EV. According to an affidavit from a Tesla employee, a search of information associated with Luthra yielded Order and Purchase Agreements only in the names of Tauseef Butt and Life Sensors Inc. See Dkt. 50 ¶¶ 2, 19. In response, Plaintiffs rely solely on the amended complaint's allegation that Luthra "purchased a Tesla vehicle with her husband in 2023." Dkt. 40 ¶ 24.

When, as here, a party brings a factual challenge to subject matter jurisdiction, a court "need not accept the plaintiff's

allegations as true but can 'weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" <u>Toddle Inn Franchising, LLC</u>, 8 F.4th at 61 n.5 (quoting <u>Torres-Negrón v. J & N Recs., LLC</u>, 504 F.3d 151, 162 (1st Cir. 2007)). Plaintiffs have not submitted evidence to rebut the affidavit from Tesla indicating that Luthra did not personally purchase a Tesla vehicle. Nor have Plaintiffs advanced any argument that Luthra has suffered an injury in fact even if she did not make the purchase herself. Luthra's claims are therefore dismissed for lack of standing. <u>Cf.</u> <u>Sasso v. Tesla, Inc.</u>, 584 F. Supp. 3d 60, 69 (E.D.N.C. 2022) (dismissing an individual's claims regarding a malfunction with a Tesla vehicle for lack of standing because the vehicle was purchased by the individual's company rather than by the individual himself).

### C. Causation

Musk also contends that all but one of the remaining named plaintiffs lack standing because, according to their Order and Purchase Agreements, they did not buy the specific EV model configurations that were the subjects of Musk's and Tesla's alleged misrepresentations about driving ranges. In Musk's view, this mismatch means that the misrepresentations did not cause any of Plaintiffs' injuries.

Musk's argument is unpersuasive. Contrary to Plaintiffs' contention, the Court can consider the extrinsic evidence of which EV model configuration each named plaintiff purchased because Musk

is raising a factual challenge to standing. That evidence, however, does not fatally undermine Plaintiffs' standing to sue.

Plaintiffs all purchased configurations of Tesla's Model 3, Model X, or Model Y EVs. The amended complaint includes representations made by Musk or Tesla about the driving ranges of those three models generally. <u>See</u> Dkt. 40 ¶¶ 49, 58, 64-65. It also describes similar representations about particular configurations of those models, such as the Model Y Long Range Single Motor and the Model 3 Standard Range Plus. <u>See</u> <u>id.</u> ¶¶ 51, 68. At this stage, it is plausible that Musk's and Tesla's statements about the Model 3, Model X, and Model Y -- and about specific configurations of those EVs -- would be understood as representations about the configurations Plaintiffs purchased. For example, the Twitter post about the range of the Model 3 Standard Range Plus plausibly conveyed information about the Model 3 Standard Range Plus Rear-Wheel Drive configuration purchased by Plaintiff Rajeev Talreja. <u>See</u> Dkt. 50-7 at 2. Moreover, the amended complaint plausibly alleges a scheme to promote false driving ranges for all Tesla EVs, with examples of misrepresentations about numerous models and configurations. Either way, it is reasonable to infer that these misrepresentations inflated the prices of the EVs Plaintiffs purchased, causing a cognizable injury in the form of overpayment. <u>See</u> <u>In re Evenflo Co., Inc., Mktg., Sales Pracs.</u> <u>& Prods. Liab. Litig.</u>, 54 F.4th 28, 35, 40 (1st Cir. 2022)

(explaining that the First Circuit "has repeatedly recognized overpayment as a cognizable form of Article III injury" and accepting at the pleadings stage the "reasonable inference" that if the defendant had not made false marketing claims, "the product would have commanded a lower price, allowing the plaintiffs to pay less for it"); Katz v. Pershing, LLC, 672 F.3d 64, 77 (1st Cir. 2012) ("[T]he causation requirement is usually satisfied when a consumer purchases a falsely advertised product because the defendant's misrepresentations would have artificially inflated the price paid by the consumer.").

In his final argument regarding standing, Musk contends that Plaintiffs lack a personal stake in raising claims concerning the dashboard range meters in Tesla vehicles that purportedly depict fictitious driving ranges. He argues that Plaintiffs' alleged injuries arose from the purchase of their vehicles and that these range meters, which Plaintiffs saw only after their purchases, could not have caused those injuries. The amended complaint alleges, however, that Musk directed the rigging of the range meters to cover up the misstatements he and Tesla made about driving ranges. That cover-up, in turn, allowed Tesla to continue to charge artificially higher prices for its vehicles. Plaintiffs therefore plausibly allege that the rigging of the range meters was part of a fraudulent scheme that caused them to overpay for their Tesla vehicles.

## II.  **Motion to Compel Arbitration**

The Court next turns to Musk's motion to compel arbitration. Musk seeks to compel arbitration only with regard to the claims brought against him individually and not those brought against him in his capacity as trustee of the Musk Trust.

### A.  **Legal Standard**

The FAA "'commands that district courts ordinarily apply the summary-judgment standard' in adjudicating a motion to compel arbitration." Aldea-Tirado v. PricewaterhouseCoopers, LLP, 101 F.4th 99, 103 (1st Cir. 2024) (quoting Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc., 43 F.4th 150, 168 (1st Cir. 2022)). Under this standard, "courts must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Id. In conducting this inquiry, a court may consider both the allegations in the complaint and any evidence submitted by the parties. See Air-Con, Inc., 21 F.4th at 171 n.1; McKenzie v. Brannan, 19 F.4th 8, 10 n.1 (1st Cir. 2021).

Under the FAA, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "a liberal federal policy favoring arbitration." Rodríguez-Rivera, 43 F.4th at 167 (quoting Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir.

2019)). "Thus, courts must 'treat arbitration as "a matter of contract" and enforce agreements to arbitrate "according to their terms."'" Aldea-Tirado, 101 F.4th at 103 (quoting Air-Con, Inc., 21 F.4th at 174).

Nonetheless, "[p]arties are not obligated to arbitrate . . . 'when they have not agreed to do so.'" Id. (quoting Rivera-Colón, 913 F.3d at 207). It follows that "[t]he court's first step in determining whether to compel arbitration is to identify a valid and enforceable agreement to arbitrate between the parties." Air-Con, Inc., 21 F.4th at 174. "The party seeking to compel arbitration bears the burden of demonstrating 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" Id. (quoting Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)). If the movant satisfies this burden, "the court has to send the dispute to arbitration 'unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself . . . or claims that the agreement to arbitrate was never concluded.'" Barbosa v. Midland Credit Mgmt., Inc., 981 F.3d 82, 87 (1st Cir. 2020) (quoting Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 508 (1st Cir. 2020)).

**B.    Musk's Ability to Enforce the Arbitration Clauses**

Plaintiffs do not dispute that they executed valid Order and Purchase Agreements with Tesla containing binding arbitration clauses or that their claims fall within the scope of those clauses. Thus, the arbitrability of Plaintiffs' claims against Musk individually reduces to one issue: whether Musk, a nonsignatory, is entitled to invoke the arbitration clauses in the contracts between Plaintiffs and Tesla.[3]

The fact that a party is not a signatory to the contract containing the arbitration clause "is not in and of itself dispositive" as to whether that party can force a signatory to arbitrate his or her claims. Id. at 88. "While in general a contract cannot bind a non-party, there are exceptions allowing non-signatories to compel arbitration and a non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract." Id. (cleaned

---

[3] The agreements signed by certain named plaintiffs contain arbitration clauses that expressly provide that courts are to decide disputes over arbitrability. See, e.g., Dkt. 50-2 at 4. The arbitration clauses in the remaining agreements provide that arbitration will be "administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules." E.g., Dkt. 50-1 at 4. As Musk explains in his brief, the First Circuit has treated incorporation of the AAA rules to evince a clear and unmistakable intent to delegate disputes over arbitrability to the arbitrator. See Toth v. Everly Well, Inc., 118 F.4th 403, 414 (1st Cir. 2024). At the motion hearing, however, Musk expressly waived any argument that the arbitrator, rather than the Court, should decide whether he can enforce the arbitration clauses as a nonsignatory. See Dkt. 76 at 28-29.

up). Such principles include agency, equitable estoppel, and third-party beneficiary. See Ouadani v. TF Final Mile LLC, 876 F.3d 31, 37 (1st Cir. 2017).

Musk raises three theories as to why he can compel arbitration despite not being a signatory to the Order and Purchase Agreements: 1) he is an "affiliate" of Tesla covered by the arbitration agreements; 2) he is an agent of Tesla; and 3) Plaintiffs are equitably estopped from arguing that they need not arbitrate their claims against him. The Court agrees with Musk's first and second theories and, thus, need not address the third.

### 1.   "Affiliate" of Tesla

Musk contends that he is entitled to compel Plaintiffs to arbitration because the arbitration clauses at issue "appl[y] to any dispute between [the purchaser] and Tesla, Inc. and its affiliates." Dkt. 50-1 at 4 (emphasis added). Musk asserts that he is an "affiliate" of Tesla because he is the company's CEO.

At its core, this argument asserts that Musk is a third-party beneficiary of the arbitration agreements. To determine if a nonsignatory qualifies as a third-party beneficiary of an arbitration agreement, courts "look[] to the parties' intentions at the time the contract was executed." Ouadani, 876 F.3d at 39. The nonsignatory "must demonstrate with 'special clarity that the contracting parties intended to confer a benefit on him.'" Hogan v. SPAR Grp., Inc., 914 F.3d 34, 39 (1st Cir. 2019) (quoting

McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)); see Landry v. Transworld Sys. Inc., 149 N.E.3d 781, 788 (Mass. 2020) ("Under Massachusetts law, a nonsignatory seeking to enforce an arbitration agreement as a third-party beneficiary must point to clear and definite evidence of the parties' intent that it benefit from the provision." (cleaned up)).

Musk unambiguously qualifies as an "affiliate" of Tesla. Courts interpret undefined terms in a contract using "their plain and ordinary meaning." Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 93 n.4 (1st Cir. 2019). While the term "affiliate" refers only to business entities in some contexts, see, e.g., 15 U.S.C. § 6809 (defining "affiliate" as "any company that controls, is controlled by, or is under common control with another company" for purposes of statutes regulating financial institutions' disclosure of customers' personal information); Affiliate, Black's Law Dictionary (11th ed. 2019) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation"), the term is ordinarily used to mean a person or organization associated with another, often via a control-based relationship. See, e.g., Affiliate, The American Heritage Dictionary of the English Language 29 (4th ed. 2000) (defining "affiliate" as "[a] person, organization, or establishment associated with another as a

18

subordinate, subsidiary, or member"); Iqbal v. Ziadeh, 215 Cal. Rptr. 3d 684, 690-91 (Cal. Ct. App. 2017) (surveying dictionary definitions and concluding that "the common meaning of an affiliate generally is one who is dependent upon, subordinate to, an agent of, or part of a larger or more established organization or group.").[4] Under this customary definition, Musk is an affiliate of Tesla because he is the company's CEO. See PWP Xerion Holdings III LLC v. Red Leaf Res., Inc., No. 2017-0235-JTL, 2019 WL 5424778, at *8 (Del. Ch. Oct. 23, 2019) ("As customarily interpreted, an officer or director of an entity is affiliated with that entity.").

Plaintiffs respond that the Order and Purchase Agreements incorporate a definition of the term "affiliate" that excludes Musk. Plaintiffs point out that each agreement states that "Tesla's Customer Privacy Policy . . . [is] incorporated into this Agreement," Dkt. 50-1 at 4, and that the privacy policy includes a "description" of the term "[a]ffiliates and subsidiaries" as encompassing "[c]ompanies that are owned or controlled by Tesla, or where [Tesla] ha[s] a substantial ownership interest," Dkt. 58-1 at 21. That description, however, is in a part of the privacy

---

[4] Like The American Heritage Dictionary of the English Language, Merriam-Webster defines "affiliate" as "an affiliated person or organization," Affiliate, Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2020), and "affiliated" as "closely associated with another typically in a dependent or subordinate position," Affiliated, Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2020).

policy that explains with what other entities Telsa may share a user's personal data. Nothing in the privacy policy or the Order and Purchase Agreements suggests that this description of the term "affiliates" provides a definition that applies to the entirely separate question of the scope of the arbitration clauses.

Plaintiffs also point to Tesla's purchaser financing agreement, which includes an arbitration clause that applies to certain claims "between the [purchaser] and [Tesla] or [its] employees, agents, successors, or assigns." Dkt. 59-1 at 5. In Plaintiffs' view, this language shows that Tesla knew how to write an arbitration clause that covers Musk and chose not to do so in the Order and Purchase Agreements. Plaintiffs add that the Order and Purchase Agreements expressly "override[]" any arbitration clause that exists between the parties in a financing agreement. Dkt. 50-1 at 4. But Tesla's use of different language in a separate contract says little about the parties' intent in requiring arbitration of disputes involving Tesla's "affiliates" in the Order and Purchase Agreements. Cf. Cortés-Ramos v. Martin-Morales, 894 F.3d 55, 60 (1st Cir. 2018) (concluding that the defendant was not a third-party beneficiary of an arbitration clause because the agreement that included the clause specifically referred to the defendant in a different provision). The key question is still what the term "affiliate" means and, as discussed above, Musk fits squarely within that term's customary meaning. Musk is a third-

party beneficiary of the arbitration clauses between Plaintiffs and Tesla and can therefore compel Plaintiffs to arbitrate their claims again him individually.

   *2. Agency*

  Alternatively, Musk contends that he may enforce Plaintiffs' arbitration agreements with Tesla under an agency theory. He argues that an agent generally may enforce his principal's arbitration agreement when sued for acts within the scope of the agency. He asserts that while Plaintiffs plead their claims against him individually, those claims actually rest on actions he took in his capacity as Tesla's CEO.

  The caselaw on whether an agent may enforce an arbitration agreement to which his principal is a party is not uniform. Generally, "state law governs the inquiry as to whether a non-party to an arbitration agreement can assert the protection of the agreement." Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 12 (1st Cir. 2014). Under California, Illinois, and New York law, which govern some of the named plaintiffs' Order and Purchase Agreements, an agent may enforce his principal's arbitration agreement when the claims against the agent concern conduct undertaken within the scope of the agency relationship. See, e.g., Coons v. Yum! Brands, Inc., 672 F. Supp. 3d 626, 636 (S.D. Ill. 2023); Soltero v. Precise Distrib., Inc., 322 Cal. Rptr. 3d 133, 142-43 (Cal. Ct. App. 2024); Hirshfield Prods., Inc. v.

Mirvish, 673 N.E.2d 1232, 1233 (N.Y. 1996). As Musk notes, however, the Massachusetts Supreme Judicial Court ("SJC") has rejected the notion that "a nonsignatory to an arbitration provision can enforce the provision solely because it is an agent of a signatory." Landry, 149 N.E.3d at 787. Under Massachusetts law, which governs at least two of the named plaintiffs' Order and Purchase Agreements, an agent can enforce his principal's arbitration agreement if "the claim against the agent arose 'under the contract in question.'" Id. (quoting Machado v. System4 LLC, 28 N.E.3d 401, 408 n.11 (Mass. 2015)).[5]

Furthermore, in Grand Wireless, the First Circuit recognized "a federal rule designed to protect the federal policy favoring arbitration" that entitles an agent "to the protection of h[is] principal's arbitration clause when the claims against h[im] are based on h[is] conduct as an agent." 748 F.3d at 11. Under this rule -- which, as just noted, is followed by many states -- an employee may enforce an arbitration agreement signed by his employer when "the underlying action in the dispute was undertaken in the course of the employee's employment." Id. This rule "is necessary . . . because a corporate entity or other business can only operate through its employees and an arbitration agreement

---

[5] The parties have not cited cases from the remaining states whose law applies under the Order and Purchase Agreements signed by the named plaintiffs.

would be a meaningless arrangement if its terms did not extend to them." Id. Put differently, a plaintiff could "avoid the practical consequences of having signed an agreement to arbitrate" by suing a corporate entity's "officers, directors or employees." Id. But the First Circuit has declined to decide whether this "uniform federal rule" favoring arbitration trumps the general rule that state law governs whether a nonsignatory may enforce an arbitration agreement. Id. at 12-13.

This case warrants application of the widely accepted rule that an employee may enforce an arbitration agreement signed by his employer when his allegedly unlawful conduct was within the scope of his employment. While the arbitration clauses at issue here do not specifically mention "employees" or "agents," they evince the parties' intent that claims of the sort Plaintiffs assert would be subject to arbitration. See Ouadani, 876 F.3d at 37 (explaining that courts applying an agency theory rely on the "signatory principal['s] intent to protect [its] agents by means of the arbitration provision[]"). The arbitration clauses broadly cover "any dispute between [the purchaser] and Tesla, Inc. and its affiliates" and "any dispute arising out of or relating to any aspect of the relationship between [the purchaser] and Tesla." Dkt. 50-1 at 4. Fundamentally, Plaintiffs' claims are all disputes with Tesla about the company's marketing of its EVs, and they relate to the relationship between Plaintiffs and Tesla. See Grand

Wireless, 748 F.3d at 10-11 (discerning an intent to allow employees to benefit from their employer's arbitration agreement where the agreement covered "any controversy or claim arising out of or relating to" the contract). The arbitration clauses also explicitly encompass "claims arising before th[e Order or Purchase] Agreement, such as claims related to statements about [Tesla's] products." Dkt. 50-1 at 4. Given this clear intent to require arbitration of claims relating to Tesla's marketing of its EVs, it is illogical to think that the parties to the Order and Purchase Agreements intended for a purchaser to be able to sue whichever Tesla employee made the statement at issue.[6]

Moreover, Plaintiffs' claims concern conduct that Musk undertook within the scope of his employment as Tesla's CEO. An employee's conduct "is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within the authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer." Smith v. Jenkins, 732 F.3d 51, 73 (1st Cir. 2013) (quoting Wang

---

[6] Plaintiffs argue that a nonsignatory must always show with "special clarity" that the parties to the arbitration agreement intended to allow him to enforce the agreement, regardless of the contractual theory he is invoking. The cases Plaintiffs cite, however, uniformly discuss the need for special clarity in the context of a third-party beneficiary theory. See Hogan, 914 F.3d at 39; Cortés-Ramos, 894 F.3d at 58; InterGen N.V. v. Grina, 344 F.3d 134, 146 (1st Cir. 2003); McCarthy, 22 F.3d at 362. Plaintiffs do not cite any caselaw applying a special clarity requirement under an agency theory.

Labs, Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1166 (Mass. 1986)). While Plaintiffs have named Musk as a defendant in his individual capacity and allege in a conclusory fashion that he "acted beyond the scope of his authority at Tesla," Dkt. 40 ¶ 14, determining "whether a claim is asserted against a party in his corporate or personal capacity 'is ultimately a function of the facts, not of pleading techniques alone.'" García Monagas v. De Arellano, 674 F.3d 45, 52 n.9 (1st Cir. 2012) (quoting McCarthy, 22 F.3d at 360). Here, Plaintiffs allege that Musk made misrepresentations about the driving ranges of Tesla EVs on company earnings calls and in company product announcements. Other misrepresentations occurred on Musk's personal X page, which Plaintiffs claim is a primary platform for Tesla marketing. See Dkt. 40 ¶¶ 40-41. And Plaintiffs describe other aspects of the allegedly fraudulent scheme that Musk took in his capacity as CEO, including directing Tesla to make misrepresentations about its EVs' driving range and to rig its EVs' dashboard meters to conceal the scheme. The facts underlying Plaintiffs' claims make clear that they are suing Musk for acts he took within the scope of his employment with Tesla.

Plaintiffs rely heavily on the First Circuit's decision in McCarthy and the SJC's decision in Landry in arguing that Musk cannot enforce the arbitration clauses in the Order and Purchase Agreements under an agency theory, but both cases are

distinguishable. In McCarthy, the First Circuit refused to allow an agent of a corporation to enforce the corporation's arbitration agreement primarily on the ground that the agreement "fail[ed] to indicate the corporate signatory's intention to protect employees through arbitration." 22 F.3d at 357. Among other things, the First Circuit relied on the limited scope of the arbitration agreement, which only covered disputes "arising under" the contract and, thus, did not suggest an intent to protect nonsignatory agents who are affiliates. See id. at 358-59. The arbitration clause in the Order and Purchase Agreements is substantially broader than the agreement at issue in McCarthy, as it applies to all claims "arising out of or relating to any aspect of the relationship between [the purchaser] and Tesla." Dkt. 50-1 at 4. This clause uses broader language than "arising under" and evinces an intent to require arbitration of disputes beyond those simply alleging breach of contract. Moreover, the arbitration clause applies to all "affiliates" of Tesla. Id. For these reasons, the Court concludes that as a matter of contract interpretation, the arbitration clause should be construed broadly to apply to Musk.

Plaintiffs' reliance on the SJC's decision in Landry is similarly misplaced. While the SJC did articulate a rule restricting the agency theory to circumstances where the claims arise under the contract containing the arbitration clause, see Landry, 149 N.E.3d at 787, it did so under materially different

26

facts than those at issue here. In Landry, a third-party debt collector sought to enforce an arbitration agreement in a contract between the plaintiff and the company to which he originally incurred a debt. See id. at 783-84, 786-87. In rejecting this effort, the SJC noted that the plaintiff did not allege any misconduct by the rental car company, that the debt collector's actions were not related to the rental contract, and that the debt collector's alleged misconduct was outside the scope of its agency relationship with the rental car company. See id. at 788. Here, by contrast, the amended complaint alleges intertwined misconduct by Musk and Tesla, Plaintiffs' claims relate to their purchases of Tesla vehicles, and Musk's alleged misconduct was within the scope of his employment. In other words, Plaintiffs' claims against Musk individually, unlike the suit against the debt collector in Landry, are an effort to circumvent binding arbitration agreements.

In short, while a nonsignatory sometimes may not enforce an arbitration agreement, the agency exception serves to prevent the type of end run around an arbitration agreement that Plaintiffs are attempting here. See Grand Wireless, Inc., 748 F.3d at 11. Because Plaintiffs' claims concern conduct undertaken by Musk within the scope of his employment as Tesla's CEO, he may enforce Tesla's arbitration agreements with Plaintiffs.

### C.    Disposition of Claims Against Musk Individually

For the foregoing reasons, the Court allows Musk's motion to compel arbitration of the claims brought against him individually by all Plaintiffs except Varsha Luthra. Under § 3 of the FAA, when a court determines that a dispute is subject to arbitration, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. This provision "compels the court to stay the proceeding" if "a party requests a stay pending arbitration." Smith v. Spizzirri, 601 U.S. 472, 478 (2024). Neither party has made such a request in this case.[7] Nonetheless, the Court concludes that staying the claims referred to arbitration is warranted to facilitate the prompt resolution of those claims in the proper forum. See id. at 477-78 (explaining that a stay serves the structure and purpose of the FAA).

### III. Motion to Dismiss for Lack of Personal Jurisdiction

Finally, the Court addresses Musk's motion to dismiss the claims against him in his capacity as trustee of the Musk Trust for lack of personal jurisdiction under Rule 12(b)(2).

---

[7] Musk requests a stay of any nonarbitrable claims if the Court determines that only some of Plaintiffs' claims are subject to arbitration. He does not, however, propose a resolution for the claims for which the Court compels arbitration.

28

A.    Personal Jurisdiction Standard

When, as here, a plaintiff invokes a federal court's diversity jurisdiction, the court "act[s] as 'the functional equivalent of a state court sitting in the forum state.'" Rosenthal, 101 F.4th at 95 (quoting Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 8 (1st Cir. 2009)). The federal court therefore has personal jurisdiction over a defendant if his "contacts with the state satisfy both the state's long-arm statute as well as the Due Process Clause of the Fourteenth Amendment." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 258 (1st Cir. 2022). The plaintiff bears the burden of showing that both requirements are satisfied. See Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 121 (1st Cir. 2022).

Musk argues that exercising personal jurisdiction over him in his capacity as trustee of the Musk Trust is inconsistent with both the Massachusetts long-arm statute and the Due Process Clause. For the reasons discussed below, the Court agrees with Musk's argument regarding the Due Process Clause and, thus, does not address whether the Massachusetts long-arm statute provides for jurisdiction over Musk in this capacity. See Rosenthal, 101 F.4th at 95 (taking this approach); Ward v. AlphaCore Pharma, LLC, 89 F.4th 203, 209 (1st Cir. 2023) (same).

The Due Process Clause requires "that a defendant 'have certain minimum contacts with [the forum state] such that the

maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" Rosenthal, 101 F.4th at 95 (alteration in original) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). A defendant's contacts with the forum state may support either general or specific personal jurisdiction, see id., but Plaintiffs argue only that the Court has specific jurisdiction in this case. A plaintiff "must satisfy three criteria" to establish "specific jurisdiction over a defendant":

> First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state. Third, the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.

Id. (cleaned up).

The parties both invoke the prima facie approach for determining whether Plaintiffs have satisfied their burden of establishing personal jurisdiction. Under this approach, "an inquiring court must ask whether the plaintiff has 'proffer[ed] evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction.'" Id. at 94 (alteration in original) (quoting Chen v. U.S. Sports Acad., Inc., 956 F.3d 45, 54 (1st Cir. 2020)). "To establish such a showing, the plaintiff must 'go beyond the pleadings and make affirmative proof.'" Id. (quoting United Elec. Radio & Mach. Workers of Am. (UE) v. 163

Pleasant St. Corp., 987 F.2d 39, 44 (1st Cir. 1993)). The court draws "the relevant facts from 'the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts.'" Id. (quoting Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016)). The court need not, however, "credit conclusory allegations or draw farfetched inferences." Id. (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).

    **B.    Due Process Analysis**

    Plaintiffs' efforts to establish personal jurisdiction over Musk in his capacity as trustee of Musk Trust rest on their allegations that Musk acted in that capacity to cause Tesla to make misrepresentations about its EVs' driving ranges and to rig dashboard range meters. These aspects of Musk's fraudulent scheme, Plaintiffs continue, targeted Massachusetts consumers and resulted in harm within the forum state. Musk responds that this argument relies on actions he took in other capacities and that Plaintiffs have not pointed to any contacts he has with Massachusetts specifically in his capacity as trustee of the Musk Trust.

    The Court agrees with Musk that Plaintiffs have not shown sufficient contacts between Massachusetts and the Musk Trust or Musk acting in his capacity as trustee to support personal jurisdiction. The necessary "relationship must arise out of

contacts that the 'defendant _himself_' creates with the forum State"
rather than any contacts that the plaintiff or a third party has
with the forum. Walden v. Fiore, 571 U.S. 277, 284 (2014) (quoting
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).
Moreover, "[i]n determining whether a court has personal
jurisdiction over a party, it is necessary to determine
jurisdiction as to the party in each capacity he or she is being
sued." Steego Corp. v. Ravenal, 830 F. Supp. 42, 50 (D. Mass.
1993). Thus, the analysis of personal jurisdiction must focus on
contacts that Musk has with Massachusetts in his capacity as
trustee of the Musk Trust and not as an individual or as CEO of
Tesla. Cf. Mojtabai v. Mojtabai, 4 F.4th 77, 89-90 (1st Cir. 2021)
(deeming a person to be two separate defendants for purposes of
personal jurisdiction when she was sued as an individual in one
claim and as executor of an estate in another).

As Musk points out, the only evidence in the record or
specific factual allegations in the amended complaint about the
Musk Trust are that it holds the Tesla stock owned by Musk, the
company's largest shareholder, and that Musk, a Texan citizen, is
the sole trustee. See Dkt. 40 ¶¶ 26, 30; Dkt. 61-1 at 16; Dkt. 61-
3 at 7; Dkt. 61-4 at 8; Dkt. 61-5 at 53. Those facts by themselves
do not suggest any contacts between Massachusetts and the Musk
Trust or Musk acting as trustee.

Plaintiffs stress that Musk used his control of Tesla generally -- and his Tesla shares specifically -- to cause the company to misrepresent its EVs' driving ranges and to rig range meters, which amounted to misconduct targeted in part to Massachusetts consumers. See Dkt. 40 ¶¶ 1, 7, 14, 28-29, 45, 62. Even assuming that Plaintiffs' allegations suffice to show that Musk and Tesla directed their fraudulent scheme at Massachusetts consumers, Plaintiffs have not adequately tied that conduct to Musk specifically acting in his capacity as trustee of the Musk Trust. Musk's control over Tesla may derive in part from his substantial stock ownership via the Musk Trust. But Plaintiffs do not plead any specific actions that Musk took in his capacity as trustee that relate to the fraudulent scheme, such as shareholder votes by Musk or transactions involving the Musk Trust.[8] Instead, Plaintiffs describe directives made by Musk in his capacity as Tesla's CEO. See, e.g., Dkt. 40 ¶ 62 (alleging that "Musk directed Tesla to prominently display . . . inflated ranges on the website"), ¶ 78 (alleging that "Musk directed Tesla's engineers to alter the software controlling the range meter"). The amended complaint's allegations that Musk took these actions in his

---

[8] Plaintiffs assert that the amended complaint alleges that Musk "voted his shares" to cause Tesla to engage in the fraudulent conduct. Dkt. 60 at 1. But the paragraph in the amended complaint that Plaintiffs cite for this allegation says only that Musk "used his near-total control of Tesla to cause it to commit the same misconduct." Dkt. 40 ¶ 1.

capacity as trustee or using his Tesla shares need not be credited because they are wholly conclusory. See Rosenthal, 101 F.4th at 94; Vapotherm, Inc., 38 F.4th at 258. As a result, these allegations do not demonstrate any relevant contacts between Massachusetts and Musk in his capacity as trustee of the Musk Trust.

The only apparent contact between Massachusetts and the Musk Trust is that Musk's fraudulent scheme resulted in increased Tesla sales to Massachusetts consumers that may have indirectly benefited the Musk Trust via a higher Tesla stock price. This contact is too attenuated to support personal jurisdiction over Musk as trustee. See Walden, 571 U.S. at 286 (explaining that personal jurisdiction must rest on more than "a defendant's 'random, fortuitous, or attenuated contacts" with the forum state (quoting Burger King, 471 U.S. at 475)). For a contact with the forum state to represent purposeful availment, that contact must "result proximately from [the defendant's] own actions," and "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there.'" Rosenthal, 101 F.4th at 96 (second alteration in original) (quoting Chen, 956 F.3d at 59). The indirect benefit the Musk Trust accrues from Tesla sales in Massachusetts is not attributable to its own conduct but, rather, to the actions of Tesla and other

third parties in selling the company's EVs to Massachusetts consumers.

Plaintiffs have not shown that Musk in his capacity as trustee of the Musk Trust has any "meaningful 'contacts, ties, or relations'" with Massachusetts. Cossaboon v. Me. Med. Ctr., 600 F.3d 25, 32 (1st Cir. 2010) (quoting Burger King, 471 U.S. at 471-72). The Court therefore lacks personal jurisdiction over the claims against Musk in this capacity.

### C. Jurisdictional Discovery

As a last resort, Plaintiffs ask for jurisdictional discovery if the Court deems the current record inadequate to support personal jurisdiction over Musk in his capacity as trustee of the Musk Trust. "[J]urisdictional discovery is not available on demand." Motus, LLC, 23 F.4th at 128. Rather, a plaintiff seeking jurisdictional discovery must both establish "a colorable claim" of personal jurisdiction and "show that it 'has been diligent in preserving [its] rights.'" Id. (alteration in original) (quoting United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 625 (1st Cir. 2001)). This latter requirement "includes the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted." Swiss Am. Bank, 274 F.3d at 626.

Jurisdictional discovery is not warranted in this case. Plaintiffs' weak arguments for personal jurisdiction over Musk in

his capacity as trustee of the Musk Trust do not sketch out even a colorable claim of jurisdiction. Moreover, Plaintiffs seek jurisdictional discovery in a conclusory two-sentence footnote that "contain[s] no indication of what facts might be developed through discovery." Motus, LLC, 23 F.4th at 128. Such a "barebones" request is insufficient to justify jurisdictional discovery. Id.; see Swiss Am. Bank, 274 F.3d at 626-27.[9]

### ORDER

Accordingly, Musk's motions to dismiss for lack of standing (Dkt. 44 and 46) are **ALLOWED** as to the claims brought by Plaintiff Varsha Luthra and otherwise **DENIED**. For the claims brought by the remaining plaintiffs, Musk's motion to compel arbitration of the claims against him individually (Dkt. 48) is **ALLOWED**, and those claims are **STAYED**. Musk's motion to dismiss the claims against him as trustee of the Musk Trust for lack of personal jurisdiction (Dkt. 46) is **ALLOWED**. The Court **DENIES** as moot Musk's motions to dismiss for failure to state a claim (Dkts. 44 and 46).

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

---

[9] Because all of Plaintiffs' claims are either dismissed on jurisdictional grounds or referred to arbitration, the Court need not address Musk's arguments that Plaintiffs have failed to state a claim under Rule 12(b)(6).